## AMERICAN RADIO ASSN., AFL–CIO, ET AL. v. MOBILE STEAMSHIP ASSN., INC., ET AL.

No. 73–748.   Argued October 21, 1974—Decided December 17, 1974

REHNQUIST, J., delivered the opinion of the Court, in which BURGER, C. J., and WHITE, BLACKMUN, and POWELL, JJ., joined. DOUGLAS, J., filed a dissenting opinion, *post,* p. 232. STEWART, J., filed a dissenting opinion, in which DOUGLAS, BRENNAN, and MARSHALL, JJ., joined, *post,* p. 234.

*Howard Schulman* argued the cause and filed briefs for petitioners.

*Frank McRight* argued the cause for respondent Mobile Steamship Assn., Inc. With him on the brief was *Kirk C. Shaw. Alex F. Lankford III* argued the cause and filed a brief for respondent Malone.\*

---

\**J. Albert Woll, Laurence Gold,* and *Thomas E. Harris* filed a brief for the American Federation of Labor and Congress of Industrial Organizations as *amicus curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed by *Solicitor General Bork* for the United States; by *Frank L. Wiswall, Jr.,* for the Republic of Liberia; by *Robert S. Ogden, Jr.,* and *Joseph*

MR. JUSTICE REHNQUIST delivered the opinion of the Court.

Petitioners are the six maritime unions which appeared before this Court as respondents in *Windward Shipping* v. *American Radio Assn.*, 415 U. S. 104 (1974). We granted their petition for certiorari to the Supreme Court of Alabama, 415 U. S. 947, in order to review their contentions that this case was distinguishable from *Windward* on the pre-emption issue, and that the temporary injunction upheld by that court had infringed rights guaranteed to them under the First and Fourteenth Amendments to the United States Constitution.[1]

As in *Windward*, this case arises from picketing designed to publicize the adverse impact on American seamen of the operations of foreign-flag carriers which employ foreign crewmen at wages substantially below those paid to American seamen. As in *Windward*, the picketing occurred during 1971, but in this case it took place in Mobile, Ala., and was directed against the *Aqua Glory*, a ship of Liberian registry. The pickets displayed the same signs and distributed the same literature as they did in *Windward*,[2] and they were subject to the same instructions.

---

*Fortenberry* for Westwind Africa Line, Ltd.; and by *Bryan F. Williams, Jr.,* for West Gulf Maritime Assn. et al.

[1] The decision of the Supreme Court of Alabama is reported at 291 Ala. 201, 279 So. 2d 467 (1973). Because that court validated only a temporary injunction, and remanded for trial on the merits, an issue has been raised as to our jurisdiction to consider this case. We think that *Construction Laborers* v. *Curry,* 371 U. S. 542 (1963), is conclusive of the finality of the judgment below for the purposes of 28 U. S. C. § 1257.

[2] The pickets carried signs which read:
"ATTENTION TO THE PUBLIC
THE WAGES AND BENEFITS PAID ABOARD
THE VESSEL SS [name of vessel] ARE SUB-

The picketing in each case also had similar results. In *Windward,* we observed: "The picketing, although neither obstructive nor violent, was not without effect. Longshoremen and other port workers refused to cross the picket lines to load and unload petitioners' vessels." 415 U. S., at 108. Here, the Supreme Court of Alabama, in affirming a temporary injunction issued by the Alabama Circuit Court, said of petitioners' activities in Mobile:

"Posting the pickets, as was done on the dock adjacent to the Aqua Glory, brought about an immediate refusal by the stevedore workers of the

STANDARD TO THOSE OF THE AMERICAN SEAMEN. THIS RESULTS IN EXTREME DAMAGE TO OUR WAGE STANDARD AND THE LOSS OF OUR JOBS. PLEASE DO NOT PATRONIZE [THIS VESSEL]. HELP THE AMERICAN SEAMEN. WE HAVE NO DISPUTE WITH OTHER VESSELS AT THIS SITE."
[Printed names of the six unions.]   App. 6a.

They distributed literature which stated:

"To the Public—American Seamen have lost approximately 50% of their jobs in the past few years to foreign flag ships employing seamen at a fraction of the wages of American Seamen.

"American dollars flowing to these foreign shipowners operating ships at wages and benefits substandard to American Seamen, are hurting our balance of payments in addition to hurting our economy by the loss of jobs.

"A strong American Merchant Marine is essential to our national defense. The fewer American flag ships there are, the weaker our position will be in a period of national emergency.

"PLEASE PATRONIZE AMERICAN FLAG VESSELS, SAVE OUR JOBS, HELP OUR ECONOMY AND SUPPORT OUR NATIONAL DEFENSE BY HELPING TO CREATE A STRONG AMERICAN MERCHANT MARINE.

"Our dispute here is limited to the vessel picketed at this site, the S. S.————" *Id.,* at 7a.

[Printed names of the six unions.]

locals of International Longshoremen's Association to cross the picket line of the appellant unions. About eighty percent of the cargo ships that enter the Port of Mobile, sail under a foreign-flag and are manned by alien crews." [3]

## I

It is apparent from the facts already stated that the Houston picketing in *Windward* and the Mobile picketing here were for all practical purposes identical. Petitioners refer to *Windward* as "involving the union petitioners in the identical national picketing dispute as part of the Committee's program . . . ." Brief for Petitioners 7 n. 1. But petitioners contend that since the state-court plaintiffs in this case are not the foreign owners of a picketed ship, as they were in *Windward,* but are instead stevedoring companies which seek to service the ship [4] and a shipper who wishes to have his crops loaded on it, the question of pre-emption of state-court jurisdiction by the National Labor Relations Act should be answered differently than it was in *Windward.* [5] Petitioners reason that respondents could have charged them with an unfair labor practice under the secondary boycott provision of the National Labor Relations Act, § 8 (b)(4), 49 Stat. 452, as amended, 29 U. S. C. § 158 (b)(4), and that since petitioners' activities were arguably prohibited under that section, the respondents' exclusive remedy was to seek relief from

---

[3] 291 Ala., at 205, 279 So. 2d, at 470.

[4] The stevedoring companies appear here through their bargaining representative, Mobile Steamship Association, Inc.

[5] Petitioners also suggest that the result should be different because *Windward* did not involve vessels which, while flying foreign flags, were American owned. Petitioners do not, however, direct our attention to any evidence in the record as to the ownership of the *Aqua Glory.* In any event, we think this factor irrelevant, in light of *McCulloch* v. *Sociedad Nacional,* 372 U. S. 10, 19 (1963).

the National Labor Relations Board. Cf. *San Diego Building Trades Council* v. *Garmon,* 359 U. S. 236 (1959).

Petitioners' position in this respect contrasts markedly with their posture in the *Windward* litigation. There petitioners, as respondents in this Court, urged that "peaceful and truthful primary picketing, non obstructive and without trespass upon private property, by American workers protesting substandard wages and benefits paid," are activities "actually protected by the Act." Brief for Respondents in No. 72–1061, O. T. 1973, p. 15. They also urged that "the American seamen's activities at bar constitutes [*sic*] typical lawful primary picketing, sanctioned and protected by the Act, *Garner* [v. *Teamsters Union,* 346 U. S. 485 (1953),] and [*Longshoremen* v.] *Ariadne* [*Co.*], 397 U. S. [195,] 202 [(1970)]." Brief for Respondents in No. 72–1061, O. T. 1973, p. 16. Petitioners apparently urged the same arguments in the Texas Court of Civil Appeals, whose judgment we reviewed in *Windward,* because that court stated:

> "[A]ppellees' picketing carefully remained within the guidelines for permissible picketing on the premises of a secondary employer promulgated in Sailor's Union of the Pacific, 92 N. L. R. B. 547 and adopted in Local 761, Inter. Union of Elec., Radio and Mach. Wkrs. v. NLRB, 366 U. S. 667 . . . (1961)." [6]

Petitioners, having failed to persuade this Court in *Windward* that their Houston picketing was *protected* under § 7 of the National Labor Relations Act, 29 U. S. C. § 157, now contend that their Mobile picketing was at least arguably a secondary boycott *prohibited* by § 8 (b) (4)(B) of the Act, 29 U. S. C. § 158 (b)(4)(B). They would have us hold not only that there is an independent controversy between petitioner unions, representing

---

[6] *Windward Shipping* v. *American Radio Assn.,* 482 S. W. 2d 675, 678 (1972).

American seamen, and the contracting stevedores represented by respondent, but also that this independent dispute is subject to the jurisdiction of the Board.

Acceptance of petitioners' argument would result in a rule whereby a state court had jurisdiction over a complaint for injunction filed by a foreign-ship owner claiming that picketing activities of a union were interfering with his business relationships with a contract stevedore, but the same court would have no jurisdiction where the contract stevedore sought an injunction on precisely the same grounds. The anomaly of such a result is reason enough to question it, but we believe that there is a more fundamental flaw in petitioners' claim.

Even if there is a dispute between petitioners and respondents which is, in some semantic sense, independent of petitioners' dispute with foreign-flag ships, that dispute is subject to state-court disposition unless it satisfies the jurisdictional requirements of the NLRA. In this regard, we note that a necessary predicate for a finding by the Board of an unfair labor practice under § 8 (b)(4)(i) is that the individual induced or encouraged must be employed by a "person engaged in commerce or in an industry affecting commerce." Similarly, a necessary predicate for finding an unfair labor practice under § 8 (b)(4)(ii) is that the person threatened, coerced, or restrained must have been engaged in "commerce or in an industry affecting commerce," and a necessary predicate for Board jurisdiction of unfair labor practices under § 10 (a) of the Act, 29 U. S. C. § 160 (a) is that they be practices "affecting commerce."

Petitioners interpret *Windward* as having done nothing more than establish that the maritime operations of foreign ships are not "in commerce." They assume that *Windward* said nothing about either the business activities of persons seeking to deal with such ships, or about whether, for these purposes, those activities are "in commerce" or "affecting commerce." Petitioners therefore

are able to state that the requirements of §§ 8 (b)(4) and 10 are satisfied because:

> "Unquestionably, the Association, constituting stevedoring companies employing longshoremen to load and discharge vessels at the port of Mobile, Alabama, is an 'employer' engaged in 'commerce' under the Act, and equally unquestionably, respondent Malone, delivering his soybeans to the dock elevator, is a 'person' engaged in 'commerce,' under the Act." Brief for Petitioners 15–16.

We do not believe, however, that the line of cases [7] commencing with *Benz* and culminating in *Windward* permit such a bifurcated view of the effects of a single group of pickets at a single site.

In *Windward* we stated that our task was to determine "whether the activities . . . complained of were activities 'affecting commerce' within the meaning of . . . the National Labor Relations Act," [8] and we concluded that they were not. 415 U. S., at 105–106. We recognized that the picketing activities did not involve the inescapable intrusion into the affairs of foreign ships that was present in *Benz* and *Incres,* but we went on to say that

---

[7] *Benz* v. *Compania Naviera Hidalgo,* 353 U. S. 138 (1957); *McCulloch* v. *Sociedad Nacional,* 372 U. S. 10 (1963); *Incres S. S. Co.* v. *Maritime Workers,* 372 U. S. 24 (1963).

[8] The relevant definitions appear in 29 U. S. C. §§ 152 (6) and (7):

"(6) The term 'commerce' means trade, traffic, commerce, transportation, or communication among the several States, or between the District of Columbia or any Territory of the United States and any State or other Territory, or between any foreign country and any State, Territory, or the District of Columbia, or within the District of Columbia or any Territory, or between points in the same State but through any other State or any Territory or the District of Columbia or any foreign country.

"(7) The term 'affecting commerce' means in commerce, or burdening or obstructing commerce or the free flow of commerce, or having led or tending to lead to a labor dispute burdening or obstructing commerce or the free flow of commerce."

the latter cases "do not purport to fully delineate the threshold of interference with the maritime operations of foreign vessels which makes the LMRA inapplicable." 415 U. S., at 114. We further observed:

> "At the very least, the pickets must have hoped to exert sufficient pressure so that foreign vessels would be forced to raise their operating costs to levels comparable to those of American shippers, *either because of lost cargo resulting from the long-shoremen's refusal to load or unload the vessels,* or because of wage increases awarded as a virtual self-imposed tariff to regain entry to American ports. Such a large-scale increase in operating costs would have more than a negligible impact on the *'maritime operations'* of these foreign ships, and the effect would be by no means limited to costs incurred while in American ports. Unlike *Ariadne,* the protest here could not be accommodated by a wage decision on the part of the shipowners which would affect only wages paid within this country."[9] *Ibid.* (Emphasis supplied.)

---

[9] Our Brother STEWART suggests in dissent that *Longshoremen* v. *Ariadne Co.,* 397 U. S. 195 (1970), requires reversal here, because in that case it was held that longshoremen servicing foreign-flag vessels in American ports are in "commerce" within the meaning of the Act. But the *Ariadne* court, in distinguishing *Benz, supra,* and *McCulloch, supra,* stated that "[t]he considerations that informed the Court's construction of the statute" in those cases "are clearly inapplicable to the situation presented here. The participation of some crew members in the longshore work does not obscure the fact that this dispute centered on the wages to be paid American residents, who were employed by each foreign ship not to serve as members of its crew but rather to do casual longshore work." 397 U. S., at 199. The Court in *Windward* reiterated that distinction:

"The pickets in *Ariadne,* unlike the pickets in *Benz* or *Incres,* were primarily engaged in a dispute as to whether an employer should hire unionized or nonunionized American workers to perform long-

While we thus spoke in *Windward* of the effect of the Houston pickets on the maritime operations of foreign ships, the quoted passage shows that we fully recognized that this effect would not be produced solely by the pickets and the messages carried by their signs. It would be produced in large part by the refusal of American workmen employed by domestic stevedoring companies to cross the picket line in order to load and unload cargo coming to or from the foreign ships. Since *Windward* held that the Houston picketing was not in or affecting commerce, it would be wholly inconsistent to now hold, insofar as concerns Board jurisdiction over a complaint by respondents, that the employer of the longshoremen who honored the picket line, or the shipper whose goods they did not handle, was in or affecting commerce.

That we found it unnecessary to expressly state this conclusion in *Windward* suggests not that the point is an undecided one, but that such a conclusion inevitably flows from the fact that the response of the employees of the American stevedores was a crucial part of the mechanism by which the maritime operations of the foreign ships were to be affected. The exaction of the "self-

shoremen's work, and the substandard wages which they were protesting were being paid to fellow American workers." 415 U. S., at 112.

Here the picketing which triggered the dispute was not directed toward any wages or conditions of employment of the longshoremen. It was instead directed to substandard wages being paid to the crews of foreign-flag vessels throughout those vessels' worldwide maritime operations. In *Ariadne,* on the contrary, the picketing was directed toward requiring a foreign-flag vessel to hire unionized American workers, rather than nonunionized American workers, to service vessels berthed in American ports. That the latter effect does not surpass "the threshold of interference with the maritime operations of foreign vessels which makes the LMRA inapplicable," *Windward, supra,* at 114, certainly provides no support for the proposition that the former effect also does not surpass that threshold.

imposed tariff to regain entry to American ports" does not depend upon American shippers heeding the message on the picket signs and declining to ship their cargoes in foreign bottoms. The same pressure upon the foreign-flag owners will result if longshoremen refuse to load or unload their ships. The effect of the picketing on the operations of the stevedores and shippers, and thence on these maritime operations, is precisely the same whether it be complained of by the foreign-ship owners or by persons seeking to service and deal with the ships. The fact that the jurisdiction of the state courts in this case is invoked by stevedores and shippers does not convert into "commerce" activities which plainly were not such in *Windward*.[10]

Our dissenting Brethren contend that our disposition is inconsistent with the Court's decision in *Hattiesburg Building & Trades Council* v. *Broome*, 377 U. S. 126 (1964), and with the Board's decision in *Sailors' Union of the Pacific* (*Moore Dry Dock*), 92 N. L. R. B. 547 (1950). *Hattiesburg* dealt with the quite different question of applying the Board's own limitation of its *statutory* jurisdiction to those cases which have "a *substantial* effect on commerce." 23 N. L. R. B. Ann. Rep. 7 (1958) (emphasis added). The Board had promulgated a series of administratively established standards, in effect ceding to state courts and agencies disputes involving entities which admittedly "affected commerce," but whose volume of interstate business was not "sufficiently substantial to warrant the exercise of [Board] jurisdiction." 29

---

[10] In so holding, we need cast no doubt on those cases which hold that the Board has jurisdiction under § 8 (b) (4) of domestic secondary activities which are in commerce, even though the primary employer is located outside the United States. See *Madden* v. *Grain Elevator Workers Local 418*, 334 F. 2d 1014 (CA7 1964), cert. denied, 379 U. S. 967 (1965); *Grain Elevator Workers Local 418* v. *NLRB*, 126 U. S. App. D. C. 219, 376 F. 2d 774, cert. denied, 389 U. S. 932 (1967).

U. S. C. § 164 (c). The standards provided that they could be "satisfied by reference to the business operations of either the primary or the secondary employer." *Hattiesburg, supra,* at 126. Because of this provision, the Board had not in fact ceded its jurisdiction over the particular dispute that had been presented to the Mississippi courts. In *Hattiesburg* this Court did no more than enforce the natural consequence of this fact by holding that *Garmon* deprived the state courts of jurisdiction. We find nothing in that holding inconsistent with what we say or hold here. Certainly *Hattiesburg* does not, as MR. JUSTICE STEWART's dissent would have it, stand for the proposition that a secondary employer's domestic business activities may be the basis for Board jurisdiction where the primary dispute is beyond its *statutory* authority over unfair labor practices "affecting commerce." 29 U. S. C. § 160 (a).

That dissent's treatment of *Moore Dry Dock, supra,* reads a great deal more into that 1950 Board decision than its language and analysis can support. The decision itself contains no reference whatever to the jurisdiction of the Board over the primary employer, the foreign-flag vessel *Phopho,* and neither the decision nor the Trial Examiner's report considered the jurisdictional challenge presently confronting this Court. The Trial Examiner's report, from which that dissenting opinion quotes, did state that the Board, in an apparently unreported determination, had previously dismissed a petition for election aboard the *Phopho,* 92 N. L. R. B. 547, 560–561. The report later acknowledged that the Board had "left somewhat obscure the precise legal basis" of its jurisdictional ruling, a comment which was evoked by the contention that because the primary employer was "clearly engaged in commerce," the ruling must have been based on a different jurisdictional defect. *Id.,* at 568. This Court in *Benz* v. *Compania Naviera Hidalgo,* 353 U. S. 138 (1957), not only noted that *Moore*

*Dry Dock* involved a different situation, but also rather pointedly stated: "We need only say that these cases are inapposite, without, of course, intimating any view as to their result." 353 U. S., at 143 n. 5. A 1950 Board precedent such as this can scarcely be regarded as controlling when it is clearly contrary to the thrust of this Court's *Benz-Windward* line of cases.

Petitioners rely on *Teamsters Union* v. *N. Y., N. H. & H. R. Co.,* 350 U. S. 155 (1956), and *Plumbers' Union* v. *Door County,* 359 U. S. 354 (1959), for the proposition that even though the Board may not have jurisdiction over the primary labor relations of a party which is excluded from the Act's definition of "employer," [11] it is nonetheless competent to consider secondary disputes involving such a party. In *Teamsters Union, supra,* a railroad was held to be barred from seeking relief in the state courts against a secondary boycott. The Court held that while the railroad was not a statutory "employer," it was nonetheless a "person" protected by § 8 (b)(4). A similar result was reached in *Door County, supra,* in which a non-"employer" county sought state court relief, not with respect to activities of its own employees, but with respect to a claimed secondary boycott arising from picketing against a nonunion subcontractor working on an addition to the county courthouse. While these cases establish the proposition that an entity which is not within the Act's definition of "employer"

---

[11] The definition appears in 29 U. S. C. § 152 (2):

"(2) The term 'employer' includes any person acting as an agent of an employer, directly or indirectly, but shall not include the United States or any wholly owned Government corporation, or any Federal Reserve Bank, or any State or political subdivision thereof, or any corporation or association operating a hospital, if no part of the net earnings inures to the benefit of any private shareholder or individual, or any person subject to the Railway Labor Act, as amended from time to time, or any labor organization (other than when acting as an employer), or anyone acting in the capacity of officer or agent of such labor organization."

may nonetheless be a "person" for purposes of protection against secondary boycotts, neither they nor any other case decided by this Court suggests that the Board has jurisdiction of § 8 (b)(4) complaints if the alleged unfair labor practice does not affect commerce. Indeed, in *Door County, supra,* the Court pointedly inquired whether the out-of-state origin of construction materials was sufficient to establish the jurisdictionally required effect on interstate commerce. 359 U. S., at 356.

Here, neither the farmer seeking to ship his soybeans, the stevedores who contracted to unload the cargo of the foreign-flag vessel, nor the longshoremen whom the stevedores employed to carry out this undertaking, were for these purposes engaged in or affecting commerce within the purview of the National Labor Relations Act. Therefore the petitioners' picketing did not even "arguably" violate § 8 (b)(4)(B) of that Act. Since Congress did not intend to strain through the filament of the NLRA picketing activities which so directly affect the maritime operations of foreign vessels, we hold that the Alabama courts were competent to apply their own law in resolving the dispute between petitioners and respondents unless, as petitioners claim, such a resolution violated petitioners' rights under the First and Fourteenth Amendments.

## II

After concluding that the state courts had jurisdiction, the Supreme Court of Alabama considered whether the picketing was protected by the First and Fourteenth Amendments. Relying on *Teamsters Union* v. *Vogt, Inc.,* 354 U. S. 284 (1957), it concluded that if the picketing compromised valid public policies, it was not protected by its putative purpose of conveying information. The court therefore thought that the matter narrowed to whether or not the picketing had a purpose or objective to "wrongfully interfere" with respondents' businesses. Recognizing that the unions were appealing a temporary in-

junction, issued as a matter of equitable discretion to preserve the status quo pending final resolution of the dispute, the court inquired only whether there was evidence of a prohibited purpose sufficient to establish that the trial judge had not abused the "wide discretion" he possesses in such matters. The court found such evidence in the testimony of a local union official charged with carrying out the picketing. He had expressed the hope that union men would not cross the lines, that the port would become cluttered with foreign ships unable to load or unload, and that the docks would be shut down. On this basis the court concluded that a substantial question was presented as to whether the picketing had a prohibited purpose, and that the trial judge had not abused his discretion.

Petitioners repeat their First and Fourteenth Amendment arguments before this Court. They contend that the picketing was expressive conduct informing the public of the injuries they suffer at the hands of foreign ships, and "imploring the public" to " 'Buy American' or 'Ship American.' " Brief for Petitioners 21. This conduct, they contend, constitutes "the lawful exercise of protected fundamental rights of free speech," and is thus not subject to injunction.

We think this line of argument is foreclosed by our holding in *Vogt, supra.* There the Court, in an opinion by Mr. Justice Frankfurter, reviewed the cases in which we had dealt with disputes involving the interests of pickets in disseminating their message and of the State in protecting various competing economic and social interests. *Vogt* endorsed the view that picketing involves more than an expression of ideas, 354 U. S., at 289, and referred to our "growing awareness that these cases involved not so much questions of free speech as review of the balance struck by a State between picketing that involved more than 'publicity' and competing interests of state policy." *Id.,* at 290. The Court con-

cluded that our cases "established a broad field in which a State, in enforcing some public policy, whether of its criminal or its civil law, and whether announced by its legislature or its courts, could constitutionally enjoin peaceful picketing aimed at preventing effectuation of that policy." *Id.*, at 293. We believe that in the case now before us Alabama's interference with petitioners' picketing is well within that "broad field."

Petitioners seek to escape from *Vogt* in three ways. First, they contend that this case is squarely controlled by *Food Employees* v. *Logan Valley Plaza*, 391 U. S. 308 (1968). In that case, claim petitioners, picketing "identical as at bar, [designed] to peacefully and truthfully publicize substandard wages and concomitantly request the public not to patronize the picketed entity," was held to be protected. Brief for Petitioners 20. In rejecting this contention, we need only point out that *Logan Valley* concerned the location of picketing, not its purpose; indeed, it was on exactly this basis that the *Logan Valley* Court distinguished the line of cases culminating in *Vogt*. 391 U. S., at 314. *Logan Valley* established only that in some circumstances private business property can be so thoroughly clothed in the attributes of public property that it may not be completely closed as a public forum to those who wish to present otherwise lawful communications.

Petitioners' second argument is that the injunction here is not supported by a "valid public policy," as required by *Vogt*. They point out that while the Alabama Supreme Court stated the public policy to be the prevention of "wrongful interference" with respondents' businesses, it did not expressly define that term. We, however, think it obvious that in this context "wrongful interference" refers to efforts by third parties to induce employees to cease performing services essential to the conduct of their employer's business. That third-party participation is critical to picketing being categorized as

"wrongful interference" is clear from *Pennington* v. *Birmingham Baseball Club*, 277 Ala. 336, 170 So. 2d 410 (1964), a case cited by the Alabama Supreme Court in its opinion in this case.

In *Pennington* the Supreme Court of Alabama indicated that the state policy against "wrongful interference" is quite analogous to the federal policy of prohibiting secondary boycotts, and is based on similar considerations. The State's policy also appears to be based on the state interest in preserving its economy against the stagnation that could be produced by pickets' disruption of the businesses of employers with whom they have no primary dispute. At Mobile the picketing threatened to eliminate the 70% to 80% of the stevedores' business that depended on foreign shipping, and to cause serious losses for farmers whose agricultural crops required immediate harvesting and shipping.[12] Under *Vogt, supra,* the State may prefer these interests over petitioners' interests in conveying their "ship American" message through the speech-plus device of dockside picketing.

Petitioners' final contention is that the record fails to support the conclusion that a substantial question existed as to whether the picketing constituted "wrongful interference" under Alabama law. The question of whether evidence is sufficient to make out a cause of action created by state law and tried in the state courts is a matter for decision by those courts. Insofar as petitioners' argument on this score may be read to suggest that the evidence before the Alabama court would not support a finding that their activities were such as could be enjoined under *Vogt, supra,* we reject it. Petitioners seem to argue that the Alabama courts were bound by

---

[12] The record indicates that all grain storage facilities in the Mobile area were full. Additional soybeans could be harvested only as those already stored were transferred to waiting vessels. App. 77a–80a.

the statements of purpose appearing on the pickets' signs and literature, and that in any event one local official's statements of his hopes and expectations as to the picketing's effect could not override those stated purposes. This argument ignores the wide latitude open to triers of fact to make factual determinations on the basis of rational inferences which arise from the nature, location, and effect of picketing. See *Vogt, supra,* at 286, 295; *Plumbers Union* v. *Graham,* 345 U. S. 192, 197–200 (1953).

Concluding that the jurisdiction of the Alabama courts in this case was not pre-empted by the National Labor Relations Act, and that the action of those courts in enjoining the picketing at Mobile violated no right conferred upon petitioners by the First and Fourteenth Amendments, we affirm the judgment of the Supreme Court of Alabama.

*Affirmed.*

MR. JUSTICE DOUGLAS, dissenting.

I agree with my Brother STEWART that the dispute in the present case is within the jurisdiction of the National Labor Relations Board and that that jurisdiction is exclusive of state jurisdiction. The foreign-flag ship involved in the present controversy is Liberian. Hence I add a few observations generated by Noël Mostert's Supership (1974) discussing the problems of the big new oil tankers and their vast pollution of the oceans of the world. He puts Liberian-flag ships in the following perspective:

> "Liberia now has the world's largest merchant marine, followed by Japan and Britain, and her lead is rapidly increasing; flag of convenience fleets have regularly grown at rates more than twice those of world fleets as a whole. Liberia and Panama together now own, on paper, nearly a quarter of world shipping. Tankers dominate these expatriate fleets.
> "Thirty-five to 40 percent of the Liberian tonnage is American-owned, and an additional 10 percent of

it is American-financed, which helps explain where the American merchant fleet, in steady decline since the end of the war, has taken itself. According to law, American-flag ships must be built in the United States and must be three-quarters manned by Americans. American shipbuilding costs used to be double those elsewhere (inflation abroad has helped make them competitive again), and American seamen's wages are still higher than elsewhere. . . .

"Flag of convenience operators often say that their ships, especially many of those under the Liberian flag, are among the largest, best-equipped, and most modern in the world. This may be true. But ships are only as good as the men who run them, and the record is not impressive. Old ships traditionally have a higher casualty rate than new ones. Liberian losses between 1966 and 1970 not only averaged twice as high as those of the other major maritime nations, but, contrary to the rule, the ships they were losing were on the whole new ones, certainly newer than the ones lost by the other principal merchant marines: the average age of Liberian losses in that four-year period was 8.7 years, while that of the Japanese and Europeans averaged 12 years.

"To a disconcerting degree, oil cargoes have been delivered in recent years by improperly trained and uncertificated officers aboard ships navigating with defective equipment." *Id.*, at 58–59.

While the Liberian-flag vessel in the present case was not an oil tanker, the quoted passages demonstrate the scope of the public interest of our people in keeping marine traffic in more responsible hands than those which the "flag of convenience" commonly uses. No public issue is today more important, at least to the life of the oceans of the world and the well-being of our own working force. Large national interests ride on today's decision. Congress, in this type of case, has appropriately

made the National Labor Relations Board the exclusive arbiter of the present controversy, as my Brother STEWART convincingly demonstrates. I accordingly would reverse the judgment below.

MR. JUSTICE STEWART, with whom MR. JUSTICE DOUGLAS, MR. JUSTICE BRENNAN, and MR. JUSTICE MARSHALL join, dissenting.

The issue in the present case is quite different from the issue decided last Term in *Windward Shipping* v. *American Radio Assn.*, 415 U. S. 104. Because the dispute in this case clearly "affects commerce" and thus falls within the exclusive regulatory power of the National Labor Relations Board, I would reverse the judgment before us.

In *Windward Shipping*, the owners and managing agents of two foreign-flag vessels sought injunctive relief in state courts in Texas to bar picketing of their vessels by several American maritime unions. The unions were attempting to publicize the competitive advantage enjoyed by foreign-flag vessels because of the substantial disparity between foreign and domestic seamen's wages. The vessels' owners and managing agents asked the state courts to enjoin the picketing as tortious under Texas law. The primary basis for this claim was that the picketing sought to induce the foreign-flag vessel owners and their foreign crews to break pre-existing contracts. The Texas courts concluded that they lacked jurisdiction to consider the complaint of interference with contract because the dispute between the foreign-flag shipowners and the American unions was "arguably" within the jurisdiction of the National Labor Relations Board.

In reversing the judgment of the Texas Court of Civil Appeals, this Court reaffirmed earlier cases that had recognized that "Congress, when it used the words 'in commerce' in the [Labor Management Relations Act], simply did not intend that Act to erase longstanding principles of comity and accommodation in international maritime

trade." 415 U. S., at 112–113. In those earlier cases the Court had concluded that maritime operations of foreign-flag ships employing alien seamen are not in "commerce" within the meaning of § 2 (6) of the National Labor Relations Act, as amended by the LMRA, 29 U. S. C. § 152 (6). Therefore, disputes affecting those operations do not "affect commerce," and are not within the jurisdiction of the Board. See *Benz* v. *Compania Naviera Hidalgo,* 353 U. S. 138; *McCulloch* v. *Sociedad Nacional,* 372 U. S. 10; *Incres S. S. Co.* v. *Maritime Workers,* 372 U. S. 24.

Although the union activity sought to be enjoined by the foreign-flag shipowners in *Windward Shipping* did not involve the same degree of intrusion into the internal affairs of foreign vessels that was present in *Benz, McCulloch,* and *Incres,* the Court concluded that the economic impact upon foreign shipping from the unions' conduct might severely disrupt the maritime operations of the foreign vessels. "Virtually none of the predictable responses of a foreign shipowner to picketing of this type," the Court noted, "would be limited to the sort of wage-cost decision benefiting American workingmen which the LMRA was designed to regulate." 415 U. S., at 115. Cf. *Longshoremen* v. *Ariadne Co.,* 397 U. S. 195. Accordingly, the Court held that the Texas courts had jurisdiction over the foreign shipowners' complaint that the union activity was interfering with pre-existing contracts between the owners and their crews.

The question presented by this case, however, is not whether state-court jurisdiction over a dispute between owners of foreign-flag vessels and American maritime unions is outside the scope of the Act, as it was in *Windward Shipping.* Rather, the question is whether state courts have jurisdiction over a complaint by an association of American stevedoring companies that secondary pressure caused by the picketing of American maritime unions constituted a wrongful interference with the

American companies' right to carry on their lawful business. Neither the language of the Act nor the principles of comity underlying our decision in *Windward Shipping* support the Court's conclusion that this dispute between American employers and American unions is outside the jurisdiction of the Labor Board.

As in *Windward Shipping,* the labor dispute in this case began when six American maritime unions picketed a foreign vessel to publicize the adverse consequences to American seamen of the low wages paid by the foreign shipowner. As a result of the picketing, American longshoremen and other workers employed by the member companies of the Mobile Steamship Association refused to service the foreign-flag vessel. It was this allegedly unlawful secondary pressure generated by the maritime unions' picketing that the Mobile Steamship Association sought to enjoin in state court as a tortious interference with its right to contract and to carry on its lawful business.

The allegedly tortious secondary pressure that formed the basis for Mobile Steamship Association's state-court complaint is precisely the type of concerted activity made subject to Board regulation by § 8 (b)(4)(i)(B) of the National Labor Relations Act, as amended, 73 Stat. 542, 29 U. S. C. § 158 (b)(4)(i)(B). That section, designed to shield neutral third parties from the adverse impact of labor disputes in which they are not involved, makes it an unfair labor practice for a labor organization "to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities . . . where . . . an object thereof is . . . forcing or requiring any person . . . to cease doing business with any other person . . . ."

I cannot agree with the Court's conclusion that the

secondary dispute between the American maritime unions and the Mobile Steamship Association that is the basis for this lawsuit fails to satisfy all the jurisdictional requirements of § 8 (b)(4)(B).[1] *Windward Shipping* and the cases on which it relied have established that the maritime operations of foreign-flag ships employing alien seamen are not in "commerce" within the meaning of the Act. Accordingly, we held in those cases that labor disputes affecting those operations do not "affect commerce," so far as the Act is concerned. But those decisions cannot be read to suggest that American stevedoring companies whose American employees load and unload both American- and foreign-flag vessels in American ports are not "engaged in commerce or in an industry affecting commerce." Indeed, in *Longshoremen* v. *Ariadne Co., 397 U. S.,* at 200, we held that longshoremen servicing foreign-flag vessels in American ports *are* in "commerce" within the meaning of § 2 (6) of the Act, and thus subject to the regulatory power of the Board. Consequently, stevedoring companies employing such longshoremen must be "engaged in commerce or in an industry affecting commerce" within the meaning of § 8 (b)(4) (B), and a labor dispute affecting their operations necessarily "affects commerce" within the meaning of the Act.

The Court's contrary conclusion appears to be based on the premise that it would be "wholly inconsistent" to hold that the unions' picketing was not "affecting commerce" so far as the primary dispute with the foreign-flag shipowner was concerned but was "affecting commerce" in the secondary dispute here involved. *Ante,* at 224. The Court does not indicate that a secondary

---

[1] Nobody has suggested that the maritime unions engaged in the secondary picketing are not "labor organizations" within the meaning of § 2 (5) of the Act, 29 U. S. C. § 152 (5), or that the longshoremen and other workers who refused to cross the picket lines and service the foreign-flag vessel are not "employees" within the meaning of § 2 (3), 29 U. S. C. § 152 (3).

dispute between the maritime unions and the Mobile Steamship Association could never "affect commerce" within the meaning of the Act, unlike the *Windward Shipping* dispute between the unions and the foreign shipowners which would never "affect commerce."

If the maritime unions had a primary dispute with American-flag shipowners, that dispute would clearly "affect commerce" within the meaning of the Act, and would thus clearly fall within the Board's regulatory power. To avoid inconsistency the Court would presumably conclude that a secondary dispute between stevedoring companies and maritime unions in such a situation would also "affect commerce." The Court would thus make the determination whether an American stevedoring company was "engaged in an industry affecting commerce," the § 8 (b)(4)(B) jurisdictional requirement, depend entirely on whether in a particular case a primary labor dispute to which the stevedoring company was not privy was between an American union and an American-flag shipowner or an American union and a foreign-flag shipowner. "The anomaly of such a result is reason enough to question it . . . ." *Ante,* at 221.

More importantly, the Court's conclusion that this secondary dispute between an American employer and American unions does not affect commerce because the primary dispute between the unions and foreign-flag shipowners is not within the Board's jurisdiction squarely conflicts with our decision in *Hattiesburg Building & Trades Council* v. *Broome,* 377 U. S. 126. In that case, an employer subjected to secondary pressure brought suit in state court to enjoin picketing at its premises. After finding that the primary employer was not in "commerce" within the meaning of the Act, the state court ruled that the pre-emption doctrine of *San Diego Building Trades Council* v. *Garmon,* 359 U. S. 236, was not applicable. The state court then enjoined the secondary picketing of the union. This Court unanimously reversed that judgment,

holding that the record clearly showed that "the *secondary* employer's operations met the [Board's] jurisdictional requirements. Since the union's activities in this case were arguably an unfair labor practice, the state court had no jurisdiction to issue the injunction." 377 U. S., at 127 (emphasis added; citations omitted).

The unanimous holding in *Broome* that exclusive Board jurisdiction over a secondary dispute exists although the primary dispute did not "affect commerce" within the meaning of the Act finds solid support in the language of § 8 (b)(4)(B) itself. The section expressly requires that the neutral, secondary employer be "engaged in commerce or in an industry affecting commerce." However, it requires only that the primary object of the secondary pressure be a "person." As defined by § 2 (1) of the Act, 29 U. S. C. § 152 (1), there is no requirement that a "person," which includes "individuals, labor organizations, partnerships, associations, [and] corporations," either be "engaged in commerce or in an industry affecting commerce," or otherwise be within the jurisdiction of the Act. See *Plumbers' Union* v. *Door County,* 359 U. S. 354 (governmental unit); *Teamsters Union* v. *N. Y., N. H. & H. R. Co.,* 350 U. S. 155 (railroad). Thus, the fact that the foreign-flag vessel which was the primary object of the unions' picketing activity was not in "commerce" cannot stand as a bar to the Board's exercise of jurisdiction over the secondary dispute in this case.

Neither considerations of comity nor a "reluctance to intrude domestic labor law willy-nilly into the complex of considerations affecting foreign trade," *Windward Shipping* v. *American Radio Assn.,* 415 U. S., at 110, justifies the Court's disregard of the clear language of § 8 (b)(4)(B) or its failure to follow the *Broome* decision. The dispute before the Alabama courts did not involve the maritime operations of the foreign-flag vessel that was the primary target of the unions' activity. The shipowners were not parties to the state-court law-

suit. The injunction approved by the Alabama Supreme Court is concerned solely with union interference with operations and contractual relations of the Mobile Steamship Association at the Port of Mobile. That one of the contractual relationships allegedly interfered with was between members of the Association and a foreign-flag vessel is not apparent from the face of the state-court injunction.[2]

In short, the dispute between American workingmen and unions and their American employers was well within the boundaries of the Act as we have defined those boundaries in *Windward Shipping, Benz, McCulloch,* and *Incres.* As such, it is indistinguishable from a number of

---

[2] The Alabama courts enjoined the six maritime unions, their officers, members, and employees, from:

"1. Loitering, congregating, or picketing, by standing, walking, marching, sitting, or otherwise, at or near any part of the premises owned, occupied, or used by members of Complainant Mobile Steamship Association, Inc.

"2. In any manner interfering with or obstructing, by words or actions, any person or persons working for or desiring to work for members of Complainant Mobile Steamship Association, Inc.

"3. Interfering with the operations of any member of Complainant Mobile Steamship Association, Inc. in any manner whatsoever.

"4. Picketing or interfering at or near Complainant Mobile Steamship Association, Inc. and its members' premises or premises used by Complainant Mobile Steamship Association's members in a manner calculated to intimidate Complainant Mobile Steamship Association's members' employees or anyone working in association with the Complainant Mobile Steamship Association's members, or any other person entering or leaving or attempting to enter or leave Mobile Steamship Association's members' premises, or calculated to induce any such persons not to report or apply for work at Mobile Steamship Association's members' premises, or any facility used by Mobile Steamship Association's members.

"5. Picketing directed at vessels with whom members of the Mobile Steamship Association, Inc. have contractual relations.

"6. Interfering with the contractual relations existing or to exist between the members of the Mobile Steamship Association, Inc. and companies owning and/or operating vessels calling at the Port of Mobile."

secondary boycott cases over which the Board has exercised its exclusive jurisdiction. For example, in *Sailors' Union of the Pacific* (*Moore Dry Dock*), 92 N. L. R. B. 547, the Board considered charges by an American drydock owner that union picketing of a Panamanian ship tied up at the drydock constituted unlawful secondary activity. The union was picketing in an attempt to be recognized as the bargaining representative of the Panamanian shipowner's crew. Prior to the Board's consideration of the secondary dispute, the union had filed a petition for certification with the Regional Director of the NLRB. The petition was dismissed " 'inasmuch as the internal economy of a vessel of foreign registry and ownership is involved.' " Upon appeal, the Board sustained the Regional Director's action on the ground that " 'upon the facts presently existing in this case, it does not appear that the Board has jurisdiction over the [e]mployer.' " *Id.*, at 560–561. Notwithstanding the Board's refusal to exercise jurisdiction over the primary dispute because it involved a foreign-flag vessel, the Board assumed jurisdiction over the secondary dispute between the union and the drydock owner. This Court in *Benz* observed that the Board's assumption of jurisdiction over the secondary dispute in *Moore Dry Dock* was very different from an attempt to assert jurisdiction over the primary dispute involving the foreign-flag shipowner. *Benz* v. *Compania Naviera Hidalgo*, 353 U. S., at 143 n. 5.[3]

Because the secondary dispute in this case implicates only American employers and their American employees, following the literal language of § 8 (b)(4)(B) and

---

[3] The only two Courts of Appeals that appear to have addressed the question have also sustained Board jurisdiction over secondary disputes involving American employers and unions despite the fact that the primary dispute involved foreign-flag vessels. *Madden* v. *Grain Elevator Workers Local 418*, 334 F. 2d 1014 (CA7); *Grain Elevator Workers 418* v. *NLRB*, 126 U. S. App. D. C. 219, 376 F. 2d 774.

recognizing the Board's exclusive jurisdiction over the dispute would not in any way undermine the principles of comity emphasized in our decision in *Windward Shipping*. The Board will only decide whether the secondary effects of the dispute are prohibited by § 8 (b)(4)(B). Exercise of this jurisdiction will not "thrust the National Labor Relations Board into 'a delicate field of international relations.'" *Longshoremen* v. *Ariadne Co.*, 397 U. S., at 199. Certainly a Board decision that secondary pressure violated § 8 (b)(4)(B) would not risk interference with international maritime trade. Nor would a decision that the secondary pressure did not violate § 8 (b)(4)(B) endanger the foreign-flag shipowners' interests in preserving the integrity of their maritime operations from the impact of the unions' picketing. These interests are fully protected under *Windward Shipping* by permitting the foreign-ship owner to seek an injunction in state court.

Where activities by parties subject to the regulatory power of the National Labor Relations Board are "arguably" prohibited by § 8 of the National Labor Relations Act, the general rule is that the jurisdiction of the Board is exclusive, pre-empting both federal- and state-court jurisdiction. *San Diego Building Trades Council* v. *Garmon*, 359 U. S., at 245; see *Longshoremen* v. *Ariadne Co.*, *supra*, at 201–202 (WHITE, J., concurring). Despite this rule the Solicitor General has suggested as *amicus curiae* that we recognize concurrent jurisdiction in state courts and the Board to enjoin secondary conduct when the primary dispute involves a foreign-flag vessel. Congress adopted such a proposal for concurrent state-court jurisdiction to award damages for conduct that violates § 8 (b)(4). § 303, Labor Management Relations Act, as amended, 29 U. S. C. § 187; see *Teamsters Union* v. *Morton*, 377 U. S. 252. But Congress expressly rejected a proposal for a comparable exception to the general rule of exclusive jurisdiction for complaints seeking injunctive

relief against secondary conduct arguably prohibited by § 8 (b)(4).[4] The only distinction between the amendment providing for general concurrent jurisdiction over secondary conduct rejected by Congress and the scheme suggested by the Government is that the Solicitor General would limit concurrent state-court jurisdiction to secondary disputes in which the primary employer was a foreign-flag shipowner. *Windward Shipping* fully protects the interests of these shipowners in maintaining the integrity of the maritime operations of their vessels by permitting them to seek state-court injunctions. Consequently, this distinction cannot justify overruling the congressional determination that American employers who enjoy the protection of § 8 (b)(4) should be limited to securing injunctive relief through the Board.

The Solicitor General also argues that there is no justification for the pre-emption doctrine in cases involving secondary disputes where the primary dispute is outside the jurisdiction of the Board. That position, of course, directly conflicts with *Hattiesburg Building & Trades Council* v. *Broome,* 377 U. S. 126, where this Court, as previously noted, reversed a state-court injunction directed against secondary conduct, holding the pre-emption doctrine applicable even though the Board had no jurisdiction over the primary dispute.

---

[4] When Congress was considering the Taft-Hartley bill in 1947, an amendment was proposed in the Senate which would have given an injured party suffering from a secondary boycott the right to go directly into a district court and seek injunctive relief. 93 Cong. Rec. 4835. Senator Taft opposed the amendment, arguing that resistance to providing a private injunctive remedy in cases of secondary boycotts was so strong that the language of the committee bill authorizing the Board alone to obtain injunctive relief should be retained. Senator Taft proposed that private parties be given only the right to sue for damages. *Id.,* at 4843–4844. The amendment was thereafter defeated, *id.,* at 4847; and Senator Taft's proposal for a private-damages remedy, presently LMRA § 303, 29 U. S. C. § 187, was adopted. 93 Cong. Rec. 4874–4875.

Moreover, even though the primary dispute is outside the Board's jurisdiction, there is a continuing need to avoid development of conflicting rules of substantive law governing concerted secondary conduct. Through initial passage and subsequent amendment of § 8 (b)(4)(B), Congress has clearly stated that certain types of secondary activity are illegal without regard to the identity of the primary employer. But just as deliberately, Congress has chosen not to prohibit resort to certain types of secondary pressure. If the Alabama law of secondary boycotts can be applied to proscribe conduct that Congress decided not to prohibit when it enacted § 8 (b)(4)(B), "the inevitable result would be to frustrate the congressional determination to leave this weapon of self-help available, and to upset the balance of power between labor and management expressed in our national labor policy. 'For a state to impinge on the area of labor combat designed to be free is quite as much an obstruction of federal policy as if the state were to declare picketing free for purposes or by methods which the federal Act prohibits.'" *Teamsters Union* v. *Morton,* 377 U. S., at 260, quoting *Garner* v. *Teamsters Union,* 346 U. S. 485, 500.

The need to avoid conflicting rules of substantive law in the labor relations area and the desirability of leaving the development of such rules to the National Labor Relations Board, the agency created by Congress for that purpose, is a "primary justification for the pre-emption doctrine." *Vaca* v. *Sipes,* 386 U. S. 171, 180. Because the secondary activity of the maritime unions challenged by the Mobile Steamship Association "arguably" violates § 8 (b)(4)(B) of the Act, that need is fully present in the instant case.

In sum, the dispute between the American unions and the American stevedoring companies in this case clearly "affects commerce" within the meaning of the Act and thus falls within the exclusive regulatory power of the National Labor Relations Board. The judgment of the Alabama Supreme Court should, therefore, be reversed.