Rouse Philadelphia, Inc. v. Ad Hoc '78

628

*Denis V. Brenan, Richard R. Goldberg* and *Allen J. Gross*, for plaintiff, Rouse Philadelphia, Inc.

*Peter A. Galante* and *Robert J. Guerra*, for plaintiff, Redevelopment Authority.

*Jacob P. Hart* and *Robin P. Lincoln*, for plaintiffs, Gimbel Brothers, Inc. and Gimbel Brothers Realty Corp.

*George D. Gould*, for defendant, Ad Hoc '78.

*John Street*, for defendant, T. Milton Street.

KREMER, *J.*, January 31, 1979—We have before us for consideration (as the primary question, as we see it) whether or not a minority and historically disadvantaged group, with what it conceives to be a correct and justified message and protest, may select as a target of boycott messages third-party nongovernment individuals with whom there are no real or bona fide disputes for the purposes of highlighting protest against the conduct of governmental agencies. The question otherwise phrased is whether defendants can engage in "scapegoat boycotting" and "scapegoat picketing" for the avowed purpose of injuring and destroying a complex of innocent and uninvolved businesses for demonstrative and symbolic purposes.

We have been cautious not to put the issue as a loaded question because our answer rests upon the facts and factual nuances as we have found them. The targets of defendants' boycotting, to which we refer, are Rouse, Gimbels, Strawbridges and the 94 business entities presently leasing space and operating businesses in The Gallery. We refer to these businesses as "innocent" because they are not really guilty of any wrongdoing by any possible stretch or twist of argumentation or imagination. These businesses have not engaged in or fostered any racial discrimination whatsoever; they have not engaged in any conduct antithetical to the interests of defendants. There is not a scintilla of evidence that these businesses are in any way responsible for any of defendants' grievances or that they could do anything to redress or remedy such grievances. We reject the excusatory suggestions that these businesses are somehow culpable simply because they have lawfully accepted benefits from the government, which could have gone to the boycotters and their communities or for other purposes.

In net effect defendants say to plaintiff businesses, we wish to use you as an example to show that some communities have benefited from the expenditure of urban renewal funds while the black[1] communities were getting less than their fair share. This message broadened into general black protest—protest against lack of black business ownership, against inadequate schooling, against alleged police brutality and against an effort to change the Philadelphia City Charter. The integrity of the protest is muddied by the immediacy of defendant T. Milton Street's candidacy and campaign for the state legislature. Defendants say, although we do not really have any direct or even indirect conflicts with you, we wish to use you as an example and a scapegoat, as a target for our mixture of social messages and protests. We intend to use you as a focus for our protests. And, if it becomes necessary, we are willing to destroy your businesses as an example of racial discriminations of the past and the failures of the present. Defendants act on the thesis that only by causing anguished cries of financial pain, even from those immediately innocent, can they get the necessary attention from the governmental and economic power structure which is in the sole possession of the white establishment.

A black activist, T. Milton Street, and some other persons and groups have been seeking government (primarily Federal) funding for housing redevelopment and community redevelopment in black communities for some period of years. These persons are convinced that they have been given a

1. As used in this opinion the reference to "black" will be deemed to comprehend Spanish and poor white communities which are also stated to be represented by defendants. However, the disputes involved are overwhelmingly ones of black confrontation.

run-around; that the government funds have been distributed discriminatorily. In order to highlight their complaints against the manner in which the Federal, state and city governments have distributed government funds, defendants selected The Gallery as a target of protest because it represents a highly successful example of an area that has received government funds in the course of urban renewal.

There is no doubt that defendants raise questions in good faith as to the fairness of Philadelphia's area allocations and designations for the use of Federal funds for housing purposes. There is substantial and disturbing indication that the black communities may not have been fairly and equally treated, but that question is not before us for consideration or resolution.[2]

In reaching our decision, we have cautioned ourselves that a dominant segment of society has numerous conscious and unconscious techniques for maintaining its ascendancy and the status quo—for resisting and slowing the process of change.

The rights of black citizens to convey messages of protest in an effective and significant manner, in an effort to help correct deep-seated historic inequities are amongst the most important aspects of the First Amendment of the United States Constitution. Picketing, parading and demonstrating in the streets may sometimes be the only communication and expressive outlets available for the poor and the disadvantaged. Certainly, in a white-dominated society, defendants have the right to protest against the entrenched results of centuries

2. This and related questions are being litigated in the Federal court in a matter in which Community Legal Services, Inc., which represents Ad Hoc here, also represents the litigants in that case.

of discrimination. They have a right to protest for the purpose of highlighting the inequities of the past and the inequities of the present and the threat of continued inequities in the future.

It is important and urgent that all legitimate avenues be kept open for First Amendment expressions of complaint and protest; but we cannot accept the thesis that the protest may take the form of injury to and destruction of innocent and uninvolved third parties for purposes of symbolism. Respect for the First Amendment does not require knee jerk responses which exclude analysis of other rights. We must avoid First Amendment reference as a magical incantation and we must test each case by its particular facts. Scapegoat boycotting for the effective purpose of injuring or destroying a business goat, without even any semblance of real dispute with such business, cannot be permitted. There is a constitutionally protected Fifth and Fourteenth Amendment business right to survive which must be balanced against First Amendment rights to deliver a message to injure and destroy.

The suppression of the dissemination of ideas is the gravest of dangers. Nothing is to be barred from communication be it called treason or heresy. The heresies of today may prove to be the truths of tomorrow and the treasons of today may prove to be tomorrow's needs for social change. We must be ever vigilant that the voice we silence is not that of some present-day Galileo. Such high-sounding language is easier to come by when we speak of Galileos. The rights of the poor and the residents of the slums may be in more need of protection. But even the poor and the dispossessed must speak within the boundaries of the law.

There are few eternal verities. Heraclitus recited one that all is change and one cannot step into the same river twice. And Einstein recited another that

all of physical reality is relative. In these senses social actions and relations are also in constant motion; man is evolving socially as well as physically. The freedom of man to think and to express himself is crucial to social evolution. It is in the memory of that experience that we owe a maximum loyalty to the First Amendment. Our decision is in keeping with this command.

The slaughter of 11 athletes at Munich as a supposed symbolic and political protest was certainly murder as to the men killed and was by any civilized standard an unacceptable barbarism. In the lesser degree (and absent personal violence) the slaughter of 96 private businesses as a supposed symbolic protest against government conduct is an unacceptable assault upon Fifth and Fourteenth Amendment rights to engage in and conduct a business, to work for a livelihood and to hold and use private property. We conclude that when a message progresses in action to militant picketing and boycotting so as to scapegoat private citizens and to convey a false impression that they have been responsible for discrimination or that they have anything to do with the protestors' grievances, then such conduct must be enjoined. Sometimes the law comes down with unequal weight upon disputing parties, particularly where one of the groups is carrying the weight of centuries of discrimination. There is puzzlement as to who shall pay the price—as to how we should struggle to rectify. Again and again we are impelled to return to the question of whether it can be constitutionally right to use a few members of the white society as a scapegoat to exemplify the accumulated disparities of three centuries. The answer must be in the negative.

We are aware of the fact that persons of great goodwill and of deep social concern must address

corrective attention to some of the protest subject matters. We are also aware that in a most real sense defendants are guilty of counter-scapegoating, rather than scapegoating. That circumstance does not lend excuse to selection of an innocent target for destruction. We cannot accept irrational counter-hatred as an appropriate answer to irrational hatred.

As a trial court we do not have sufficient time for relaxed study and analysis of the theoretical elements of the First Amendment as it relates to boycotting and picketing. We do not bottom our decision on distinctions between speech and conduct or between speech and speech-plus, or on distinctions between coercion and persuasion. See, e.g., The Invisible Hand and Clenched Fist: Is There a Safe Way To Picket Under The First Amendment? 26 Hastings L. J. 167 (1974).

We do not rely upon any single concept whether it be of so-called unlawful purpose, or conspiracy, or slander sub silentio or improper and unlawful conduct. Our decision is a response to the combination of all of these matters in this case. A felt instinct for fundamental fairness impels us to stop defendants —they have gone too far and too awry in their otherwise forgivable efforts to be heard effectively. To rule otherwise would be a declaration that plaintiffs are beyond the protection of the law, that plaintiffs are to be denied of the due process right of survival.

A boycott cannot be for a lawful purpose when it is designed and intended to, inter alia, punish a small group of citizen businessmen for lawfully accepting benefits from city, state or Federal governments. And in this case the benefits result because of long term Federal and local programs and planning. The boycott thus seeks to frustrate and defeat crucially significant governmental public welfare

programs and policies dealing with problems of urban blight and decay.

Defendants have the right to contend that the urban renewal funds used to correct circumstances of center city blight should more wisely and more fairly be used to correct circumstances of housing blight in north central Philadelphia. We must bear in mind that it is contended that the very government itself permits and promotes these funds to be discriminatorily allocated to benefit primarily white communities. That is an important and valid message. That is a matter for public disclosure, debate and political action. It is not a matter for indiscriminate injury to and destruction of some other recipients of the benefits of governmental plans and programs as a symbol of protest against the government.

The court has not decided whether the Redevelopment Authority is entitled to injunctive relief. Such determination is unnecessary because the nongovernmental plaintiffs are entitled to injunctive relief. In this case there is a dispute between defendants and the RDA insofar as the RDA is a government agency which defendants claim is dominated by the governmental authorities and administration which defendants accuse of discrimination. The utmost caution should be exercised before any court silences criticism of the government or any of its agencies.

In reaching our conclusion we have been mindful of the fact that the present Supreme Court of the United States may be narrower in the construction of some constitutional protections than our own Supreme Court of Pennsylvania. Therefore, in applying the constitutional protections afforded by the Pennsylvania State Constitution, the state is not bound by narrower Federal constructions. That was made clear in the case of Willing v. Mazzocone,

482 Pa. 377, 393 A. 2d 1155 (1978). However, if we are correct that we are here concerned with a balance of competing Federal constitutional rights, then our state courts are bound by the Federal decisions which address the scope of Fifth and Fourteenth Amendment rights of due process as balanced against First Amendment speech protections.

## HISTORY OF CASE

The case is before us on plaintiffs' motion for preliminary injunction. There are three plaintiffs. Plaintiff Rouse Philadelphia, Inc. (Rouse) is a Maryland corporation licensed to do business in Pennsylvania. Rouse is engaged in the operation of an enclosed, four-level shopping mall known as The Gallery, located in downtown Philadelphia. It leases places of business within The Gallery from the Redevelopment Authority of Philadelphia and Gimbels, and sub-leases property to approximately 94 merchants. Plaintiff Gimbel Brothers, Inc. (Gimbels) is a New York corporation licensed to do business in Pennsylvania. Gimbels owns and operates a large department store which anchors the western end of The Gallery complex. Plaintiff Redevelopment Authority of the City of Philadelphia (RDA) is a nonprofit Commonwealth authority, established pursuant to the Urban Redevelopment Law of May 24, 1945, P.L. 991, as amended, 35 P.S. §1701 et seq. The Redevelopment Authority is authorized, among other things, to exercise the right of eminent domain, to purchase and acquire real estate, to clear buildings and other improvements therefrom, to enter into agreements with others, to own real estate and convey or lease it to others, all for the purposes of redevelopment of real estate and the elimination of blighted areas. The Redevelop-

ment Authority owns The Gallery and was the developer and general contractor for the construction of The Gallery.

Defendant Ad Hoc '78 (Ad Hoc) is an unincorporated association of community organizations. They are acting to induce the public to boycott the stores in The Gallery and the Gimbels department store. Defendant T. Milton Street is a representative of and chairman of Ad Hoc '78. Defendants John Doe and Jane Doe are names for unidentified members of Ad Hoc or other individuals, who are acting in concert to boycott The Gallery and Gimbels.

This controversy began on August 25, 1978, when approximately 3,000 to 5,000 persons gathered at 9th and Market Streets at about 1:00 p.m. and engaged in a protest against The Gallery. This demonstration marked the commencement of defendants' boycott of The Gallery. Various demonstrators, including political representatives, gave speeches on a variety of subjects.

About 500 demonstrators entered The Gallery without interference from the police who were present in large numbers.[3] Inside The Gallery, the protestors paraded in and about and from level to level constantly shouting and singing and chanting on various themes.

The protest inside and outside The Gallery was peaceful. There was no actual violence or threats of violence or destruction of property. However, the demonstration was so massive and noisy and angry-sounding as to necessarily inspire fears of potential violence. The demonstrators kept shout-

3. The use of large police presence was a reasonable form of governmental conduct consistent with duties to protect persons and property and within the scope of police judgment and discretion.

ing they were not going to take it any more. The businesses in The Gallery were brought to a virtual standstill.

Signs were carried relating to police brutality, the charter change, the MOVE situation, absence of any black-owned stores in The Gallery, lack of housing in poor and black neighborhoods, public money being spent on The Gallery and other topics of public concern. Most protest activity took place in the public areas and the courtyards inside and outside The Gallery. The demonstrators continuously conducted themselves in a loud and raucous and militant and bellicose manner. Some of the shouting was done over bullhorns. At various times the demonstrators sat down in the walkways of The Gallery and in the Market Fair area to listen to speeches given over portable amplifying equipment. During such times, egress and ingress to the shops in The Gallery, particularly the Market Fair restaurants, was impeded or blocked by the demonstrators, some of whom sat and stood on the tables (reserved for eating) in Market Fair.

On the evening of August 25, 1978, plaintiffs petitioned this court (as Emergency Judge) for immediate ex parte injunctive relief. The court, having previously received a telephonic request for opportunity to be heard[4] from John Street, Esq., as attorney for defendants, promptly scheduled a hearing for 9:30 p.m. that evening. The hearing was postponed at the request of plaintiffs and a hearing was then set for 7:00 a.m. the following Saturday morning. After testimony commenced, by agreement of all parties, this court issued a temporary injunction enjoining and restraining mass picketing and defining permissible conduct.

---

4. Opportunity to participate should be given unless it is impossible to serve or notify the opposing parties: Apple Storage Co., Inc. v. CEPA, 441 Pa. 309, 314, 272 A. 2d 496 (1971).

August 31, 1978 was set as the date for hearing on the motion for preliminary injunction. Testimony was heard[5] until October 26, 1978. The parties submitted numerous requests for findings of fact and conclusions of law and supporting briefs and supplemental briefs. The last supplemental request for findings was filed on November 27, 1978. Constitutional issues of importance are presented.

Our detailed findings of fact and conclusions of law are appended to this opinion. [See Editor's note, supra.] We have reviewed and considered and passed upon the very extensive requests for findings submitted by each party.

## RE. RIGHT TO BOYCOTT

Picketing is a form of both assembly and speech and consequently comes within the protective guarantees of both the First Amendment to the Constitution of the United States and Article I, §7 of the Constitution of the Commonwealth of Pennsylvania:[6] Thornhill v. Alabama, 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093 (1940); Carlson v. California, 310 U.S. 106, 60 S.Ct. 746, 84 L.Ed. 1104 (1940); Westinghouse Electric Corp. v. United Electrical Workers, 353 Pa. 446, 46 A. 2d 16 (1946); Pennsylvania L. R. Board v. Chester & Delaware Counties Bartenders, etc. Union, 361 Pa. 246, 64 A. 2d 834 (1949); Wortex Mills v. Textile Workers U. of A., 369 Pa. 359, 85 A. 2d 851 (1952); 1621, Inc. v. Wilson, 402 Pa. 94, 166 A. 2d 271 (1960). Picketing is a legally protected method of expression when used to enlighten the public about a dispute or

---

5. At the request of the Administrative Judge, the Emergency Judge continued to handle the matter.

6. Art. I, §7, of the Pa. Const. provides, inter alia, that ". . . every citizen may freely speak, write and print on any subject, being responsible for the abuse of that liberty."

grievance with a business. Although it may incidentally discourage customers from entering or patronizing a store or other business, it still remains as protected expressive conduct: Moore v. Newell, 548 F. 2d 671, 672 (6th Cir. 1977).

However, there are special circumstances attendant to picketing which characterize this form of expression as "speech plus" as opposed to "pure speech." Being a hybrid form of speech, picketing does not enjoy the same full measure of First Amendment protection as pure speech and it must be analyzed from a slightly different perspective. " 'Picketing by an organized group is more than free speech, since it involves patrol of a particular locality and since the very presence of a picket line may induce action of one kind or another, quite irrespective of the nature of the ideas which are being disseminated.' "[7]

Because picket lines and picketers can so easily induce action regardless of the message being conveyed, courts have been sensitive to the special circumstances attendant to picketing. Although it is protected conduct, picketing is more susceptible to court regulation than other forms of speech. This results from the inherent nature of picketing which generally publicizes grievances and calls for public support to honor the cause. Oftentimes the grievances involve business practices. Therefore, picketing frequently calls into question the property rights of others. Courts are also sensitive to the concomitant constitutionally protected property rights of the targets of picketing. Balancing First Amendment rights of expression and Fifth

7. International Brotherhood of Teamsters, Inc. v. Vogt, 354 U.S. 284, 289, 77 S.Ct. 1166, 1 L.Ed. 2d 1347 (1957); see Bakery & P. Drivers and Helpers v. Wohl, 315 U.S. 769, 62 S.Ct. 816, 86 L.Ed. 1178 (1942); Carpenters & J. Union v. Ritter's Cafe, 315 U.S. 722, 62 S.Ct. 807, 86 L.Ed. 1143 (1942).

Amendment property rights (both of which are applicable to the states through the Fourteenth Amendment) sometimes presents a delicate and difficult task. When First Amendment rights have the effect of infringing upon others' property interests, it is necessary to take a critical look at the circumstances. It may be that property damage is incidental to protected expressions. It also is possible that injury to that property is the very purpose of the expressive conduct. When this is the case, that expression may be an unwarranted and unprotected infringement upon others' property rights.

There is no doubt that defendants intend to injure and inflict economic damage upon plaintiffs' businesses. Plaintiffs argue that this purpose is malicious and unlawful. They argue that this illegal purpose renders what might otherwise be lawful rights of expression unlawful. Under Pennsylvania law an illegal purpose may make peaceful and orderly picketing unlawful. In Wortex Mills, Inc. v. Textile Workers Union of America, C.I.O., 369 Pa. 359, 85 A. 2d 851 (1952), the Pennsylvania Supreme Court was called upon to decide the lawfulness of mass picketing in the contex of a labor dispute. The court held that mass picketing was illegal, and that, where coercion and intimidation and threats accompanied picketing, such picketing was illegal and would be enjoined. The court noted at p. 363: "Freedom of speech gives no right of intimidation or coercion and no right to damage or injure another's business or property, except where this results indirectly from peaceful and orderly picketing for a purpose which the law regards as legitimate and lawful."

The court also stated that an unlawful purpose vitiates otherwise lawful picketing at p. 369:

*"A State Court may enjoin unlawful picketing or picketing which is conducted in an unlawful*

*manner or for an unlawful purpose. Picketing, if peaceful, orderly and for a legitimate or lawful purpose, is legal and within the protection of the Constitution. However a State is not required to tolerate in all places and in all circumstances even peaceful picketing by an individual; it is well established that the method or conduct or purpose or objective of the picketing may make even peaceful picketing illegal.*" (Emphasis in original.)

In 1621, Inc. v. Wilson, 402 Pa. 94, 166 A. 2d 271 (1960), the court recognized a right to obtain equitable relief from a boycott that was being conducted for an objective which violated a legitimate, clearly defined law or public policy of the state. The court refused to enjoin picketing of a taproom by certain unincorporated neighborhood organizations. The picketing continued daily, except Sunday, and included signs such as, "Luther King did it why can't we;" "Please do not patronize excess bar;" "We need classrooms not taprooms;" "We can't be bought please don't patronize this bar." The court stated at pp. 107-8 that the objective of the picketers was to convince passersby "by means of persuasion, not to patronize the establishment so that in time its operation would become uneconomical and appellant would transfer the liquor license to another location, or failing in that, to persuade the appellant to so police his patrons that the most blatant of evils complained of would cease so that the peacefulness and good character of the neighborhood would not be destroyed."

The picketing was deemed lawful since the purpose was to protest against an admitted nuisance in fact. The court carefully noted, however, at p. 108, that if the objective of the picketing violated a "le-

gitimate, clearly defined law or public policy of the state," it could be prohibited.

The 1621 court focused critical attention on the objective of the picketing. All picketing, regardless of its purpose, serves to some extent to discourage customers from entering or patronizing a business. In 1621, the court found the picketers' effect upon plaintiff's business to be incidental to their primary objective of protecting their neighborhood against nuisance. It follows then, that a distinction between permissible picketing and impermissible picketing turns on whether the picketers' activity incidentally harms plaintiff's business in their pursuit of their primary and lawful purpose, or whether the primary purpose is to maliciously injure plaintiff's business.

The purposes and objectives of the boycott are reflected in the boycott literature, the actions of the demonstrators, and in Mr. Street's testimony.

Defendants accused the city government of policies of racial discrimination with regard to public housing and job opportunities over a period of more than 25 years. They contended that shopping districts and housing should be developed in other communities and asserted that center city development deprived the poor of needed Federal rehabilitation funds. They also charged racial discrimination in education for minorities (of failure to keep the schools open).

In the boycott literature defendants protested that over $25,000,000 of Federal moneys was spent to build The Gallery and that another $12,000,000 was to be spent for a Gallery II. Defendants protested that there were housing moneys expended to enrich center city businessmen and that no money was spent for housing in black and other poor communities—particularly in Mr. Street's North

Philadelphia area. It was urged that businesses who profit from such activity should not be supported.

The boycotters demanded that "the people who planned, built and run The Gallery pay back the full amount of all Federal monies, plus interest, to black, spanish-speaking and poor (white) neighborhoods." A demand was also made that "The same people make summer jobs for Black, Spanish-speaking and Poor White youth and also permanent opportunities (spots) for Black and Spanish-Speaking businesses." Mr. Street and the boycotters took the position that because the merchants, Gimbels and Rouse, received the benefit from use of Federal funds which could have been used for housing, that there was an obligation to pay back funds into black communities; that the merchants pay into an escrow fund which could be established for housing and other social problems in North Philadelphia and other communities. Mr. Street stated that Rouse owed an obligation to address problems experienced by the black community; that Rouse should build or rehabilitate some houses. Although Mr. Street stated that he was not telling Rouse, Gimbels or the merchants what to do, that is not accurate. One of the major boycott demands was that payments be made for benefits received, particularly in the form of programs in the black and poorer communities.

In essence, the picketing began with an avowed purpose of demanding "reparations" from plaintiffs. Thereafter and in the course of the trial defendants endeavored to soften the impact of such demands. Mr. Street undoubtedly recognized that the original statement of boycott purposes was too broad, bordered on the illegal and was inappropriate as to businesses not really involved in any way

with his political disputes and black-white controversies. He knows that his real arguments are with the government and not with the merchants. He tried to create and recite a lawful boycott purpose insofar as the innocent businesses were concerned. We do not think he succeeded.

Mr. Street testified as follows (on September 19, 1978):

"I think that Center City, Market Street East should be developed, but I think it should be developed mutually with the development of the communities. What we had hoped to happen is to send a message to the City, to the federal government, to whomever it is necessary, that you can develop Center City and ignore the communities if you want to, but we will not support you as long as you continue to ignore the needs of the community, the housing needs of the communities where we live. We will not support The Gallery, we will not support your new Gallery, we will not support your new Gallery that's coming, until you change your policy to begin to address yourself to some of the needs that we have in the community where we live."

Mr. Street made it clear that the purpose of the boycott was to deliver a message to the City and that The Gallery was to be bankrupted and sunk unless that message was acknowledged and acted upon. In another approach Mr. Street made it clear that the bankruptcy of The Gallery and its businesses might be a necessary price in order for him to focus attention on the needs of the black community.

Mr. Street testified as follows (on September 19, 1978):

"THE WITNESS: I think the obligation should be to—could come in several forms. I think the mer-

chants who are receiving that benefit, that substantial benefit from being there, could organize and have an escrow fund to help us with housing in North Philadelphia. They could help us with housing anywhere. I think that they could organize to help us open up a larger business on Columbia Avenue, Susquehanna Avenue. I think that they could make a contribution to organizations that are dealing with social problems in the communities where we live. After all, they are receiving the benefit. They have received the benefit from the substantial sums of money that come from the federal government.

" . . . .

"THE WITNESS: Well, what I am saying was, the purpose of the boycott is not just to sink The Gallery. We have no real motive, no real purpose, nothing can be gained by boycotting or bankrupting The Gallery. However, there is something to be gained if the people who put all of the—or a substantial amount of public funds into The Gallery, and who intend to put substantial large amounts of funds into the expansion of The Gallery to buy or purchase and rebuild, or to build The Gallery in the ten hundred block of Market Street. We would not hesitate in doing that.

BY MR. (JOHN) STREET:

Q. You wouldn't hesitate—

A. Sinking, bankrupting them."

Mr. Street further testified as follows (on October 16, 1978):

"A. The merchants wouldn't have to particularly do anything for me to end the boycott. What has to happen is the city administration, we are after the city administration, the Redevelopment Authority, the Rizzo administration, the people who are spending the money, the people who are putting the

money—we are boycotting a public building, abuilding that was built with a substantial amount of public funds. That's what we are boycotting. We are asking people not to go in that building for the reasons that I prior stated.

"The city administration, the Redevelopment Authority, the John Gallery Office—not The Gallery, but John Gallery, those are the people who can resolve our problem; those are the people that we can talk to about what they can do for North Philadelphia."

Although defendants are very vague as to just how they expect to accomplish their purposes, at the bottom line they make it clear that the dispute is not with The Gallery. Their dispute is with the City Administration, the Authority and HUD, which must act to meet and satisfy the boycotters' demands and needs. It is stated that plaintiffs' businesses are boycotted because they occupy a building constructed with the aid of public funds and therefore they receive benefits arising out of the expenditure of public funds. Mr. Street claimed a First Amendment right to boycott any institution or building that benefited directly or indirectly from public funds which could have gone into the black community. It is conceded that the funds used to construct The Gallery were never allocated or earmarked for housing or any other purposes.

Mr. Street tried to portray a dispute with the merchants and Gimbels. He did not succeed. He testified (October 16, 1978):

"BY MR. (JOHN) STREET:
Q. You have a dispute with the merchants of the Gallery that you have described on direct examination.
A. Absolutely.

Q. What must the merchants do to resolve that dispute?

A. The merchants can—

Q. Not what they can, what must they do?

A. They can't.

Q. They couldn't do anything to resolve it?

A. They can't.

. . .

What I want to know is: what must the merchants do in order to resolve the dispute which you and your group have with them?

A. I don't know.

Q. You don't?

A. Not at this point, I don't know.

Q. What must Gimbels do in order to resolve the dispute which you have with them, as you have described it?

A. I don't know at this point."

In addition to the foregoing, the demonstrators protested against the fact that Gallery businesses were not owned by blacks. The record and history are clear that the reason that there are only a few black business owners in The Gallery is not related to any discrimination by Rouse or any conduct of Rouse or, indeed, to any particular governmental conduct. It is a result of the absence of or limited availability of black capital—which, in turn, is a result of the historical disparities between the accumulation of white and black capital.

The demonstrators also protested against police brutality, the treatment of the MOVE group, the policies of the City government and in opposition to a proposed change in the city charter with regard to mayoral succession. They also protested about problems of black unemployment and problems relating to schools. Plaintiffs have no relationship to any of these issues whatsoever.

Scapegoat is defined in Webster's Third New International Dictionary[8] as a "person, group, race or institution against whom is directed the irrational hostility and unrelieved aggression of others." In this case, The Gallery[8A] is designated as the "target"—as the goat. None of defendants' grievances can be redressed by The Gallery. However seriously defendants injure plaintiffs, plaintiffs remain powerless to meet or satisfy or to affect or effect the demands of defendants. Defendants assert grievances against the Police Department, the City of Philadelphia, the Redevelopment Authority and the Department of Housing and Urban Development. They do not have any real or actual dispute whatsoever with The Gallery collectively, or with the 94 individual proprietors, except for their very existence. Yet the demonstrators have chosen as their targeted victim The Gallery which is defenseless to meet the demands of the picketers.

*Scapegoat boycotting urges concerted refusal to have business relationships with a "target" consisting of a limited number of persons, for the purpose of protesting against and symbolizing protest against the actions and conduct of third parties, although the "target" has no relationship to or involvement in or any control over or power to affect the primary disputes between the protestors and the third parties. As to the "target" the sole purpose of the boycott is to cause damage, injury and destruction for symbolic purposes. In*

8. The term "scapegoat" traces to an ancient Biblical ritual described in Leviticus XVI. 10. On the Day of Atonement the high priest symbolically transferred the sins of the people upon a goat, which then was banished into the desert to die.

8A. In this opinion it is obvious we sometimes use the term "The Gallery" to include Gimbels and Rouse and sometimes Strawbridge and Clothier.

*a true scapegoat boycott the "target" has no power or authority to force concessions from the third parties. In a true scapegoat boycott there is no real or bona fide dispute, primary or secondary, between the "target" and the boycotters.*

The absence of any dispute has crucial implications. Assuming a dispute, a picketed business could negotiate an agreement and free itself from the economic effect of the picketing. In this case, plaintiffs are helpless; there is nothing they can do to affect or effect the stated purposes of the protest. Only the bankruptcy of plaintiffs would appease the pickets.[9] Defendants hope that an injured or bankrupt Gallery will induce concessions from the government. They intend painful message and demand of the city and Federal government that they can no longer ignore defendants' communities.

A boycott such as that which occurred in Claiborne Hardware, Inc. v. NAACP[9A] is *not* a scapegoat boycott. In the Claiborne case, blacks in Port Gibson, Mississippi protested systematic white racial discrimination. A boycott was organized against all local white merchants demanding that they exert pressure on the city government to enact reforms. The Mississippi court found a conspiracy in violation of a state antiboycott law and a violation of the state antitrust law and a tortious interference with business relations. That

9. See and compare E.M.W. Bar Corp. v. Hilliard, 29 D. & C. 2d 435 (1959).

9A. No. 78,353 (Miss. Ch. Ct. Aug. 9, 1976). See Madison, Mississippi's Secondary Boycott Statute: Unconstitutional Deprivations of the Right to Engage in Peaceful Picketing and Boycotting, 18 How. L.J. 583 (1975); Sandifer & Smith, The Tort Suit for Damages: The New Threat to Civil Rights Organizations, 41 Brooklyn L. Rev. 559 (1975); Note, Political Boycott Activity and The First Amendment, 91 Harv. L. Rev. 659 (1978).

court rejected contentions that the state law violated First Amendment rights of freedom of expression.

We do not agree with the rationale of the Mississippi court and we make it clear that this is not a sister opinion to that case. It is valid, indeed, for an oppressed group to protest and disturb the complacent discrimination of a dominant majority.[9B] And it must be valid, indeed, for a minority group to confront a majority group in protest of its discriminations. Illegality of purpose is imported only when the protest targets upon one or some few individuals for the purpose of scapegoating and symbolizing them. It is at that point that there is an unlawful invasion of the due process rights of survival of others.

Defendants' testimony clearly indicates the motivation underlying the boycott. Defendants feel they have come away (comparatively) empty-handed in their attempts to secure housing moneys and commitments from the City of Philadelphia and the Federal government. Sensing that they have exhausted their administrative and political remedies, they have embarked on a new course of action, the boycott of The Gallery. Through this effort, they seek to communicate their grievances to the government. It is not Rouse or the merchants who can satisfy the demands of the demonstrators and boycotters. Defendants suggest that an injured or bankrupt Gallery can induce the government to meet the demands of the picketers, and thereby secure relief for the merchants from the burdens of the boycott.

9B. The bus boycott of 1955 by black citizens of Montgomery, Alabama, to protest racial discrimination (see N.Y. Times, December 6, 1955, at p. 31, and February 22, 1956 at p. 1, and Martin Luther King, Stride Towards Freedom (1958)), was in response to a primary dispute.

We hold that such strategy is a malicious misuse of defendants' exercise of their First Amendment rights. Such scapegoat picketing does not enjoy the protections afforded to other forms of expressive conduct. The Gallery has been unlawfully targeted as an economic scapegoat to express defendants' grievances against the government. Each plaintiff's business is a property right: Truax v. Corrigan, 257 U.S. 312, 42 S.Ct. 124, 66 L.Ed. 254, 27 A.L.R. 375 (1921). The property rights of plaintiffs are protected by the Fifth and Fourteenth Amendments against this assault by defendants. Defendants' rights of freedom of expression do not carry a right to maliciously damage and destroy the unrelated property rights of others. Scapegoat picketing goes beyond the pale of constitutionally protected rights of free expression. It is clearly a tortious invasion of property rights, to purposely injure an innocent and uninvolved party's business in order to coerce concessions from a third party government. Having no dispute with the picketers and having no power of correction, plaintiffs' only recourse is to suffer damages. Defendants are engaged in a thinly disguised coercive assault, with what the law must regard as unlawful purpose and malevolent motives. Such unlawful conduct is not constitutionally protected as a supposed First Amendment expression in such circumstances.

Defendants have postulated that plaintiffs had a duty to contribute to business and housing development in North Philadelphia and other poor minority neighborhoods because they received and accepted benefits from the government which could have gone to others. After an initial indication by the court that such demands might be unlawful, Mr. Street watered down the demand and said that plaintiffs "could" and not "should" set up

a fund to help promote black housing and business interests. However, in the context of the boycott, it is necessarily indicated that the boycott will continue until plaintiffs perform their supposed obligations. There is no right or privilege to demand "reparations" or affirmative action from private persons not guilty of past or present discrimination. Affirmative action is a legal obligation of the government not of isolated individuals. With regard to all of defendants' grievances as to housing, black business ownership, charter change as to mayoral succession, police brutality, treatment of the MOVE group, education and schools, plaintiffs have neither responsibility nor power to act. We will not protect defendants' First Amendment conduct when expressed for extortionate and illegal purposes.[10]

Defendants argue that the court is not to be concerned with the plight of the merchants of The Gallery who are not parties to this suit. This contention ignores the effect of defendants' actions, as well as the nexus between Rouse and its subtenants. Rouse has leased property to the merchants at a rental based in part on a percentage of volume in sales. Higher volume increases the rentals paid to Rouse. The merchants' gains or losses are also Rouse's gains or losses. Although they are not formally joined as parties to the suit, the merchants' interests are interwoven with Rouse's interests.

Defendants have alleged that they do have a dispute with Rouse. At the beginning of the trial, they were under the mistaken belief that there were no black store owners in The Gallery. In fact, one of the most common chants during the demonstrations of

10. See United States v. Kubacki, 237 F.Supp. 638, 640 (E.D. Pa. 1965); United States v. Mitchell, 463 F. 2d 187 (8th Cir. 1972).

August 25 and 26, 1978, was "We don't own, so we don't shop." However, Mr. Street testified that the issue of black ownership was really irrelevant; that if The Gallery were entirely black-owned the boycott would continue because the issue was addressed to the expenditure of public moneys on housing.

The testimony indicated that approximately 44 percent of the employes of the retail stores are black and approximately 45 percent of the managerial and supervisory personnel of the retail stores in The Gallery are black; approximately 68 percent of Rouse's employes are black; and approximately 50 percent of Rouse's supervisory and managerial personnel are black. Defendants did not offer a scintilla of evidence that Rouse discriminated against blacks in its leasing operations or that Rouse, Gimbels, Strawbridges or any of the 94 Gallery businesses was guilty of any act of discrimination against any minority.

This creation of an illusion of discrimination by Rouse and The Gallery businesses where there has been no discrimination whatsoever is a serious wrong. The boycott has aspects of libel and slander when it falsely portrays discrimination where there is none. To the extent that defendants, by their protest, have created an impression to the public that plaintiffs have been guilty of discrimination, that is a cruel hoax and an illegal destruction of the rights of innocent persons to engage in and operate a lawful business. Plaintiffs are entitled to the full protection of the law so that they cannot be cavalierly sacrificed to the supposition that the right to convey an important message imports the right to falsely accuse and resultantly injure or destroy persons who are not in any way party to the problems or plights of disadvantaged minorities.

This testimony reaffirms the fact that defendants' real focus is upon the needs of the black community that are allegedly being ignored by the city and Federal governments. The fact is that the boycott purposes were shifting and confusing in nature. In a sense defendants simply flailed out against The Gallery as a supposed symbol of the entire white community. The boycott arose out of the general economic disparities between whites and blacks and the entire historical pattern of white economic superiority. Defendants' ultimate focus became the contention that the government itself was the discriminating instrument and that public funds were being funneled discriminatorily into white communities and white operations to the prejudice of black communities in general and to the prejudice of the North Philadelphia black community in particular.

The only dispute with The Gallery is its very existence. The city, state and Federal governments made policy determinations that The Gallery was a project which would share their common support. The Gallery has promoted economic stimulation to a formerly decaying part of the city. It provides over 1,000 new jobs and a sixfold increased property tax base for the city. Defendants, however, are critical of the expenditure of government moneys that do not address their housing grievances. Because The Gallery was the beneficiary of a public policy on the city, state and Federal level, defendants assert it is their right to injure or destroy that shopping complex to communicate their dissatisfaction with the policies and priorities of government. Such conduct is beyond the pale of constitutional protection.

In Birl v. Philadelphia Electric Co., 402 Pa. 297, 300, 301, 167 A. 2d 472 (1960), the court adopted section 766 of the Restatement, 2d, Torts, which

defines the tort of inducing a breach of contract or a refusal to deal: "'one who, without a privilege to do so, induces or otherwise purposely causes a third person not to (a) perform a contract with another, or (b) enter into or continue a business relation with another is liable to the other for the harm caused thereby.'" This definition was refined to consist of the following three elements, that "the actor must act (1) for the purpose of causing this specific type of harm to the plaintiff, (2) such act must be unprivileged, and (3) the harm must actually result."

In Glenn v. Point Park College, 441 Pa. 474, 272 A. 2d 895 (1971), the court adopted the holding made by then Judge, now Chief Justice Eagen, in Locker v. Hudson Coal Co., 87 D. & C. 264, 267-268 (1953):

"[I]t seems established that a person's business is a property right in the pursuit of which he is entitled to protection from tortious interference by a third person, despite the absence of an express contract between the parties to continue their business relationship. This is certainly the trend of the law since the beginning of the twentieth century and the rapid growth of industry and trade. We do believe, however, that in order for there to be an actionable wrong, it is necessary to plead and prove in a situation such as this: (1) That the acts complained of were wilful and intentional; (2) that they were calculated to cause damage to plaintiff in his business; (3) that they were done with the unlawful purpose of causing damage and loss to plaintiff without right or justifiable cause on the part of defendant; (4) that actual damage and loss resulted. The 'malice' above referred to does not imply any culpable intent but rather is it the intentional doing of a harmful act without justification

or excuse. Defendant may have had under the present stated facts the legal right to do the acts complained of, but if they were done with the intent to injure plaintiff, then they were malicious and the malice makes unlawful that which otherwise would be lawful."

In discussing the elements of the tort of inducing a refusal to deal, the Glenn court found that the existence of a prospective contractual relation between the third person and plaintiff was a threshold ingredient. In Adler, Barish, Daniels, Levin and Creskoff v. Epstein, 482 Pa. 41, 393 A. 2d 1175 (1978), the Supreme Court recently affirmed the vitality of Birl and Glenn while modifying the privilege element of the tort. The focus is more on whether the conduct is "improper" rather than whether the conduct is "unprivileged." The court adopted the guidance of section 767 of the Restatement, 2d, Torts, which focuses on what factors were to be considered in determining whether conduct is "improper":

"In determining whether an actor's conduct is intentionally interfering with a contract or a prospective contractual relation of another is improper or not, consideration is given to the following factors: (a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference and (g) the relations between the parties."

Appying the standards of Birl, Glenn, Locker and Adler, it is clear that defendants are engaged in

tortious conduct. The evidence indicates that (at least in its initial stages) the boycott cost Gimbels and other merchants almost one-third to one-half of their estimated sales volume. The boycott, by its very terms, is intended to induce prospective customers of The Gallery to refuse to enter into any contractual relationship with The Gallery's merchants. Hundreds of prospective customers have refused to deal with plaintiffs as a result of defendants' conduct. The purpose of the boycott is to cause this specific type of harm to plaintiffs. Defendants' conduct is "improper" due to its underlying malicious intent. There is no doubt that plaintiffs have suffered considerable harm, both as a result of lost sales and in goodwill. All elements of the tort of "wrongful interference with prospective advantage" are here present.

The boycott violates Pennsylvania tort law as pronounced by the highest court in this Commonwealth. In American Radio Assn. v. Mobile Steamship Assn., 419 U.S. 215, 95 S.Ct. 409, 42 L.Ed. 399 (1974), the Supreme Court held as did the Pennsylvania Supreme Court in 1621, supra, that such tortious conduct in violation of state law and state policy could be enjoined.

In a line of cases that culminates in International Brotherhood of Teamsters v. Vogt, Inc., 354 U.S. 284, 77 S.Ct. 1166, 1 L.Ed. 2d 1347 (1957), the Supreme Court clearly established the principle that picketing-conduct or picketing-speech which is conducted for a purpose contrary to state law or state policy is not entitled to protection under the First Amendment.

In Giboney v. Empire Storage & Ice Co., 336 U.S. 490, 503, 69 S.Ct. 684, 93 L.Ed. 834 (1949), the picketing held enjoinable was a single and integrated course of conduct designed to compel a vio-

lation of Missouri's valid anti-trust law. The court concluded that it was "clear that appellants were doing more than exercising a right of free speech or press. . . . They were exercising their economic power together with that of their allies to compel Empire to abide by union rather than by state regulation of trade." Similarly, in Hughes v. Superior Court of California, 339 U.S. 460, 70 S.Ct. 718, 94 L.Ed. 985 (1950), the objective of the picketing was to secure submission by a retail establishment to a demand for employment of Negro workers in proportion to the number of Negro customers. This objective was declared to be unlawful, for, if successful, the picketing would have caused the retailer to discriminate on the basis of race in its hiring practices, contrary to the then declared public policy in the State of California. The Supreme Court further added that it is immaterial that the state's policy is expressed by the judiciary as opposed to the legislature. In International Brotherhood of Teamsters etc. Union v. Hanke, 339 U.S. 470, 70 S.Ct. 773, 94 L.Ed. 995 (1950), the Supreme Court upheld a state injunction prohibiting picketing where the objective was contrary to a valid public policy of the State of Washington. In Building Service Employees International Union v. Gazzam, 339 U.S. 532, 70 S.Ct. 784, 94 L.Ed. 1045 (1950), decided the same day as Hughes and Hanke, the Supreme Court affirmed a state injunction which prohibited picketing where the objective was in violation of the State of Washington's statutory policy against employer coercion of employes' choice of bargaining representative.

Eventually, in International Brotherhood v. Vogt, supra, the Supreme Court established a definitive principle for application in so-called "unlawful purpose" cases. In that case, unions had sought

unsuccessfully to induce some of Vogt's employes to join the unions. After their efforts failed, the unions commenced to picket the entrance to Vogt's gravel pit. As a result, drivers of several trucking companies refused to deliver and haul goods to and from the plant, and the company was substantially damaged. At the request of Vogt, a Wisconsin trial court enjoined the picketing, and the Wisconsin Supreme Court upheld the injunction on the ground that the picketing was for an unlawful purpose, namely, to coerce the employer to interfere with its employes and their right to join or not to join the union. An appeal to the United States Supreme Court followed.

In rendering the Supreme Court's decision in Vogt, Justice Frankfurter carefully traced the evolution of the concept that states can enjoin picketing in violation of a valid public policy of the state. Noting the broad pronouncements of Thornhill, he observed at 354 U.S. 289: "Soon, however, the Court came to realize that the broad pronouncements, but not the specific holdings, of Thornhill had to yield 'to the impact of facts unforeseen,' or at least not sufficiently appreciated." Justice Frankfurter further observed that the line of cases subsequent to Thornhill "made manifest that picketing, even though 'peaceful,' involved more than just communication of ideas and could not be immune from all state regulation." Those cases also demonstrated an awareness that the crucial question was not so much one of free speech but, rather, whether the state court had struck a proper balance between the communication activities and the competing interests of state policy. In concluding its discussion, the court articulated the following principle at 293: "This series of cases, then, established a broad field in which a state, in enforc-

ing some public policy, whether of its criminal or of its civil law, and whether announced by its legislature or its courts, could constitutionally enjoin peaceful picketing aimed at preventing an effectuation of that policy."

Recently the Supreme Court case applied the so-called "unlawful purpose" doctrine in American Radio Assn. v. Mobile Steamship Assn., 419 U.S. 215, 95 S.Ct. 409, 42 L.Ed. 2d. 399 (1974). There, maritime unions peacefully picketed and distributed leaflets at a public dock, urging persons to boycott foreign flagships allegedly employing non-American crews at substandard wages. The conduct of the unions was peaceful and nonviolent. There was no mass picketing, no trespassing on the property of others, no blocking of ingress and egress, no assaults and no covert acts of force. A state trial court enjoined the unions' activities at the public dock.

The Alabama Supreme Court relying on Vogt, Hughes and other "unlawful purpose" doctrine cases, held that there was sufficient evidence to support the trial court's finding that the conduct of the unions was done with the goal of interfering with the business of appellees in their shipping and farming operations, and, therefore, properly enjoined. State public policy was found to be violated because one of the purposes of the unions' action was to "wrongfully interfere" with appellees' business.

Relying on the Vogt case, the Supreme Court of the United States, at p. 230, concluded that there was no labor dispute but that Alabama's interference with the unions' activities was well within the "'broad field in which a State, in enforcing some public policy, whether of its criminal or its civil law, and whether announced by its legislature or its

courts, could constitutionally enjoin peaceful picketing aimed at preventing effectuation of that policy.'" In response to the unions' claim that the injunction in American Radio was not supported by a "valid public policy," the Supreme Court stated at 231:

"In Pennington the Supreme Court of Alabama indicated that state policy against 'wrongful interference' is quite analogous to the federal policy prohibiting secondary boycotts, and is based on similar considerations. The State's policy also appears to be based on the state interest in preserving its economy against the stagnation that could be produced by pickets' disruption of the businesses of employers with whom they have no primary dispute . . . Under Vogt, supra, the State may prefer these interests over petitioners' interests in conveying their 'ship American' message through the speech-plus device of dockside picketing."

Despite the unions' claims in the American Radio case that their activities were for informational and publicity purposes only, the Supreme Court found that another purpose of the unions' activity was to interfere wrongfully with the business at the state dock. Evidence of this prohibited purpose was based upon the testimony of a single union official charged with carrying out the picketing, who at p. 229, "had expressed the hope . . . that the port would become cluttered with foreign ships unable to load or unload, and that the docks would be shut down." The court upheld the Alabama Supreme Court's finding that to "wrongfully interfere" with the appellees' property interests was against state policy. The court found Vogt to be controlling, and upheld Alabama's prohibition of petitioners' picketing. Thus, American Radio reaffirmed and established unequivocally that a state may enjoin picket-

ing engaged in for a purpose contrary to the law and public policy of a state.

Is American Radio distinguishable from this case because it is the conduct of the government itself (Redevelopment Authority) which is addressed in grievances? There would be grave danger if government were the silencer of protest against itself. We are not deciding anything with regard to the dispute between defendants and government. Defendants, by their conduct, make it clear that that is not the question before us. Defendants (perhaps as a sad result of their angers at historical and present mistreatment, discrimination and oppression) have moved beyond the pale of permissible conduct and have flailed out on various issues so as to strike at persons innocent of wrongdoing or involvement in these issues and who are admittedly unable to redress defendants' grievances or to respond to attacks upon them by correcting something. The boycott is a scapegoat boycott. The Gallery is unlawfully made a rallying point for what might otherwise be justified dissidence. Instead it is a scapegoat boycott for unlawful purpose.

Under the present state of the law in Pennsylvania, picketing is constitutionally protected as a means; however, it is not protected when used for the purpose of accomplishing an unlawful end: 1621, Inc. v. Wilson, supra.

The legislature enacted the Urban Development Act to promote elimination of blighted areas and supply sanitary housing in areas throughout the Commonwealth. The Redevelopment Authorities, throughout the state, are authorized to engage in the elimination of blighted areas and to plan and contract with private, corporate or governmental redevelopers for their redevelopment. The Redevelopment Authority of the City of Philadelphia (RDA) is an agency of the Commonwealth of Penn-

sylvania whose sole purpose is to carry out and effectuate the purposes and provisions of the Urban Redevelopment Act.

Faced with a decaying downtown business district, and an exodus of the shopping public to the shopping malls located in the Philadelphia suburbs, RDA undertook to help rejuvenate retail business activity in center city Philadelphia. As part of this urban renewal plan, RDA launched development of The Gallery. RDA contracted with plaintiff, Rouse-Philadelphia, Inc., for the planning and development of The Gallery. The concept of this plan was initiated by the City Planning Commission in the 1960's. Pursuant to its statutory authority, RDA prepared and submitted plans which were approved by City Council. Councilmanic hearings were held so that the general public could present views relative to the plan. When RDA filed its declaration of taking, one of the tenants challenged the condemnation. The taking was upheld: Simco Stores v. R.D.A., 455 Pa. 438, 317 A. 2d 610 (1974). The general public had opportunity to make known any views relative to the Market Street East development.

RDA, however, was essentially a "pass-through agency which is carrying out the city's planning objectives in the Market Street Project (The Gallery)." Before RDA and Rouse-Philadelphia, Inc. entered into their lease agreement, they required certain assurances from the city prior to final approval by HUD. HUD's involvement was crucial because the Market East Project was constructed with some 24.5 million dollars of Federal moneys. HUD was concerned that the city protect the public interest and improvements.

The Gallery was therefore a project which shared the support of municipal, state and Federal gov-

ernments. The planning and development of the project was an exercise of public policy at three governmental levels designed to rejuvenate public and consumer interest in the center-city business district, develop a stronger tax base, provide over 1,000 jobs and fight urban decay.

It is not within the province of this court to pass upon the wisdom of such policy decision. We must determine whether defendants' conduct is intended and designed to defeat the implementation of the public policy of the state.

Defendants believe that governmental expenditure of public moneys in Philadelphia should address their housing grievances. Because The Gallery has benefited from government moneys, though not moneys which defendants would have received, it has been targeted as an economic scapegoat. Defendants state the problem with simplicity, if they are not the beneficiaries of these or other public moneys, then they shall act to destroy The Gallery (or any other chosen target) because it was chosen instead as a beneficiary for governmental assistance. Instead of mobilizing their forces for purposes of legislative and policy input, defendants have chosen to injure the manifestation of what they consider an irresponsible and discriminatory policy. Such unjustified injury is malicious in law. Where defendants maliciously attempt to injure plaintiff's business, they are in violation of Pennsylvania tort law and the long term public policy of the state. The law is clear that picketing for purposes contrary to state law or state policy can be enjoined in its entirety. The people of the city and the Commonwealth have the right to expect that the courts will protect the implementation of public policies.

It is troubling that as a result of the illegal object-

ive underlying defendants' protestations, they have lost some of their rights to express otherwise protected speech. We considered whether we could carve out and prohibit the unprotected speech, while still permitting the protected informational speech. Unfortunately, a resolution along such lines by way of a bifurcated order appears to be impossible.

The protestors' mob-like activities of August 25 and August 26, 1978, left an indelible false impression in the eyes of some of the public that The Gallery was supposedly guilty of discrimination and that it was in some way responsible for defendants' grievances. Picketing continued at The Gallery on virtually a daily basis. The public was left with the impression that The Gallery had done "something" to warrant being picketed. The initial purpose of the picketers was to injure or destroy The Gallery and that is still the picketing and boycott purpose. Defendants engaged in some informational picketing, but their constant advocacy is to "Boycott The Gallery." Unfortunately defendants' unlawful purpose taints the entirety of their expressive conduct. The Pennsylvania Supreme Court held that picketing may be enjoined if one of its objects is unlawful even though not the sole object: Anchorage Inc. v. Waiters & Waitresses Union, 383 Pa. 547, 119 A. 2d 199 (1956). In this case the otherwise protected speech is inextricably interwoven with the unprotected speech. The public is unable to discern between wat constitutes acceptable speech conduct and that which is enjoinable. Otherwise legitimate speech interests lose their special privilege under the law when so intertwined with unlawful purposes. We must therefore prohibit all of defendants' speech interests at The Gallery in furtherance of scapegoat boycotting.

Defendants have argued a combination of two themes: (1) that under the law and the Constitution of the Commonwealth of Pennsylvania a court of equity will not enter an injunction which operates as a prior restraint on speech, Willing v. Mazzocone, 482 Pa. 377, 393 A. 2d 1155 (1978); and (2) that it is axiomatic in First Amendment cases that there is no right or power in the government to consider the content of speech or to distinguish speech on the basis of its message: Police Department of City of Chicago v. Mosley, 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed. 2d 212 (1972).[11]

In the Willing v. Mazzocone case, lawyers sought to enjoin a former client from picketing and libelous conduct which falsely charged the attorneys with stealing her money and "selling out" to an insurance company. Her conduct included carrying a sandwich-type board sign denouncing the lawyers, pushing a shopping cart on which she placed an American flag, and continously ringing a cow bell and blowing a whistle to attract attention. There was some indication she was mentally ill. Mazzocone is not controlling here. It held, inter alia, that defamation will not be enjoined by a court of equity. Mr. Justice Manderino stated on behalf of a 4-3 majority (of which majority 3 were concurrences), at p. 382, as follows:

---

11. Hudgens v. N.L.R.B., 424 U.S. 507, 96 S.Ct. 1029, 47 L.Ed. 2d 196 (1976); Organization For A Better Austin v. Keefe, 402 U.S. 415, 91 S.Ct. 1575, 29 L.Ed. 2d 1 (1971); Cohen v. California, 403 U.S. 15, 24, 91 S.Ct. 1780, 29 L.Ed. 2d 284, 293 (1971); Street v. New York, 394 U.S. 576, 89 S.Ct. 1354, 22 L.Ed. 2d 572 (1969); New York Times Co. v. Sullivan, 376 U.S. 254, 269-270, 84 S.Ct. 710, 11 L.Ed. 2d 686, 700, 95 A.L.R. 2d 1412 (1964), and cases cited; NAACP v. Button, 371 U.S. 415, 445, 83 S.Ct. 328, 9 L.Ed. 2d 405, 425 (1963); Wood v. Georgia, 370 U.S. 375, 388-389, 82 S.Ct. 1364, 8 L.Ed. 2d 569, 579 (1962).

"Our conclusion that the equity court violated appellant's state constitutional right to freely speak her opinion—regardless of whether that opinion is based on fact or fantasy—regarding appellees' professional integrity obviates the need for any discussion here of federal law."

The Mazzocone case must be distinguished from this case. Mazzocone addressed the power to impose a prior restraint on defamation. This case only minimally involves possible defamation insofar as there is a false portrayal of discrimination. This case addresses the power of equity to enjoin speech of the picketing and boycott class, when such picketing-speech is exercised for an unlawful purpose. The Supreme Court did not consider any question as to Ms. Willing's purpose. The court did not decide the effect, if any, of an unlawful purpose upon the otherwise undoubted right to freedom of expression.

In Mr. Justice Pomeroy's concurring opinion he referred to Judge (now President Judge) Jacobs' dissenting opinion (joined by Judges Hoffman and Spaeth) in the Superior Court, 246 Pa. Superior Ct. 98, 109, 369 A. 2d 829, 834 (1977), and incorporated it by reference into his concurrenc dissent Judge Jacobs stated at 112, 369 A. 2d 836: "There are a few exceptions to the rule prohibiting an injunction against libel or slander. For example, an injunction may be granted where the false statements are part of a conspiracy to injure, or where there is intimidation or coercion." And he stated at p. 116: "Equitable jurisdiction to interdict libelous publication has been assumed . . . where there is a conspiracy to maliciously injure a plaintiff's business or property [citing cases]." Judge Jacobs noted an absence of such evidence.

Thus, in Mazzocone the only reference to free speech in conjunction with an unlawful purpose and malicious intent to injure indicates that such speech may sometimes be enjoined. Mazzocone is distinguished on another ground. Ms. Willing had a primary dispute which gave rise to her conduct. She believed, reasonably or unreasonably, that her attorneys owed her $25. In this case, the demonstrators have no dispute with plaintiffs. This absence of a dispute has critical significance in the context of an economic boycott. In this case, where no dispute exists, plaintiffs are unable to address or deal with defendants' demands. We conclude that the law which prohibits prior restraint does not restrict our authority to enjoin a scapegoat boycott and picketing and speech conducted for unlawful purposes.

In Police Department of the City of Chicago v. Mosley, 408 U.S. 92, 95, 92 S.Ct. 2286, 33 L.Ed. 2d 212 (1972), the court stated: "But, above all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter or its content." Out of this restriction it is often too flatly stated that the courts, therefore, may not examine or consider the nature of or content of speech. The fact is and the cases show that the courts do examine content and they must examine content in order to make decisions and to determine whether speech enjoys the full protection of the First Amendment.

In Chaplinsky v. New Hampshire, 315 U.S. 568, 571-572, 62 S.Ct. 766, 86 L.Ed. 1031 (1942), the court stated:

"(I)t is well understood that the right of free speech is not absolute at all times and under all circumstances. There are certain well-defined and

narrowly limited classes of speech, the prevention and punishment of which has never been thought to raise any Constitutional problem. These include the lewd and obscene, the profane, the libelous, and the insulting or 'frighting' words — those which by their very utterance inflict injury or tend to incite an immediate breach of peace. It has been well observed that such utterances are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality."

It is not the right to lie which is of value or the subject of First Amendment protection, it is the right to speak (and hopefully and incidentally, but only hopefully and incidentally,) to tell the truth. The power to suppress the right to lie may pour over into a power to suppress ideas and truth. We tend to absolutize the right of speech in order to avoid erosion of the right. But we cannot lose sight of the fact that the right of speech is not absolute.

In F.C.C. v. Pacifica Foundation, 438 U.S. 726, 744, 98 S.Ct. 302, 57 L.Ed. 2d 1073 (1978), Mr. Justice Stevens stated: "The order must therefore fall if . . the First Amendment prohibits all governmental regulation that depends on the content of speech. Our past cases demonstrate, however, that no such absolute rule is mandated by the Constitution."

In Schenck v. U.S., 249 U.S. 47, 52, 39 S.Ct. 247, 63 L.Ed. 470 (1919), Mr. Justice Holmes made it clear that both the content and the context of speech are subject to examination by courts in order to determine whether First Amendment protections apply and the scope of such protections.

In a boycott, speech as a stuff can be lethal. When it is used for such purposes and we evaluate the

validity and propriety of purpose we are necessarily examining content. The prohibition is against examining content to evaluate the acceptability of its ideas. There must be examination in order to determine whether the speech violates criminal law, public policy or tort law. There must be examination in order to determine whether the speech is for a lawful or an unlawful purpose. We conclude that the general rule which prohibits inquiry into the content of speech does not restrict our authority to inquire into the lawfulness of boycott purpose.

### ENTITLEMENT TO PRELIMINARY INJUNCTIVE RELIEF

A preliminary injunction should be issued when three requisites are met: (1) its issuance is necessary to prevent immediate and irreparable harm; (2) greater injury would result by refusing the preliminary injunction than by granting it; and (3) until a final determination can be made, the decree properly restores the parties to their status as it existed immediately prior to the alleged wrongful conduct: Alabama Binder & Chemical Corp. v. Pennsylvania Industrial Chemical Corp., 410 Pa. 214, 189 A. 2d 180 (1963).

Where defendants have engaged in an unlawful scapegoat boycott and have engaged in mass demonstrations, both inside and outside The Gallery, have wrongfully interfered with plaintiffs' property and business rights, have caused plaintiffs to lose sales and business, have trespassed on plaintiffs' property, and have intimidated and interfered with customers, employes and merchants inside and outside The Gallery and Gimbels, greater injury would result by refusing the preliminary injunction than by issuing it, and its issuance is necessary to prevent further immediate and irreparable harm.

If the parties so wish, they may agree that the preliminary injunction decree shall be and become a final decree and, therefore, immediately appealable.

We shall append to this opinion, wherein we have concluded that all scapegoat boycott activity is illegal and must be enjoined, our findings of fact and our conclusions of law. We are also filing a supplemental opinion upon the assumption that our conclusions that all boycott activity must be enjoined is incorrect. In the supplemental opinion we have considered the manner in which boycott activity, if lawful, may be conducted. [See Editor's note, supra.] Repetition of our findings of fact and our conclusions of law is unnecessary. Each opinion should be deemed to incorporate therein all findings of fact implicit in the other opinion. Although this procedure greatly lengthens our opinions, in this way we intend to make the record and our disposition complete, so that an appellate court need not at some future time remand the matter.

In view of all of the foregoing, we conclude that under the established law and public policy of this Commonwealth, plaintiffs' rights to engage in business and earn a livelihood transcends defendants' rights to freedom of speech, particularly when such speech is used for purposes of scapegoat boycotting and to maliciously injure and destroy plaintiffs' business interests. Accordingly, we enter the following

## DECREE AND ORDER

And now, January 31, 1979, the temporary and special injunction orders heretofore issued by this court on August 26, 1978 are modified and amended as follows:

1. Defendants, T. Milton Street and Ad Hoc '78,

together with their agents, servants and those acting in their interest or at their direction, are enjoined and restrained preliminarily, until final hearing, and thereafter until further order of this court, from picketing, handbilling, speechmaking, demonstrating, and boycotting inside or outside The Gallery or Gimbels, including the public areas therein, or on any of the three colonnades located outside the entrance to Gimbels, or the exterior courtyard area, or the sidewalk which forms the immediate perimeter surrounding The Gallery, Gimbels and Strawbridges' stores.

2. The Sheriff of Philadelphia County, with the assistance, when necessary, of the Civil Affairs Unit of the Philadelphia Police Department, or any other necessary law enforcement agency, is directed to use all power under the law to insure full compliance with all of the terms of this preliminary injunction.

3. That the Sheriff of Philadelphia County is authorized, at all times during the term of this injunction decree, to have such personnel or representatives present at The Gallery building and/or the areas contiguous thereto as he shall deem necessary for the purposes of enforcing this decree.

4. That the two bonds heretofore filed herein by plaintiff Rouse Philadelphia Inc. in the sum of $5,000 each, conditioned for payment of such costs and damages as may be incurred or suffered by any party found to be wrongfully enjoined and restrained, shall remain in full force and effect and no additional bond is required.

5. This decree and order shall remain in full force and effect until such time as this court specifically orders otherwise.

6. All orders and decrees heretofore entered are superseded by and are merged into this decree and order.